**AMERICAN GREYHOUND RACING, INC., et al., Plaintiffs,**

**and**

**Tucson Greyhound Park, Inc., Plaintiff in Intervention,**

**v.**

**Jane Dee HULL, et al., Defendants.**

**No. CIV. 00–2388–PHX–RCB.**

United States District Court, D. Arizona.

July 3, 2001.

Neil Vincent Wake, Linda Delmor Skon, Law Offices of Neil Vincent, Phoenix, AZ, for Plaintiffs.

W. Scott Bales, Thomas John Dennis, Atty. Gens. Office, Phoenix, AZ, Richard Wingfield Garnett, III, Maricopa County Atty's Office, Phoenix, AZ, for Defendants.

Donald M. Peters, Timothy Andrew La-Sota, Miller, LaSota & Peters, PLC, Phoenix, AZ, for Intervenor Plaintiff.

## ORDER, AND FINDINGS OF FACT AND CONCLUSIONS OF LAW

BROOMFIELD, Senior District Judge.

This is a case with potentially serious implications for the future of gaming in Arizona. A synopsis of the court's decision can be found beginning on page 1029.

The Plaintiffs are permittees of horse and dog racing facilities in Arizona. Am. Compl. (doc. # 45) ¶¶ 1–2. The Plaintiff–Intervenor Tucson Greyhound Park, Inc., is a permittee for a dog racing enterprise. Am. Compl. (doc. # 52) ¶ 1. The Defendants include state authorities responsible for negotiating gaming compacts with Indian tribes and enforcing state laws prohibiting certain forms of gaming. *Id.* ¶¶ 3–5. At issue is the kind and breadth of gaming that the Arizona Governor may include in compacts with Indian tribes. The Plaintiffs and the Intervenor seek to enjoin the Governor from entering new, renewed or modified gaming compacts that would allow Indian tribes in Arizona to conduct slot machine, keno or blackjack gaming. Of the nineteen gaming compacts currently obtaining between the State and tribes, the first will begin to expire in 2003.

### BACKGROUND

I. Procedural Background

This action began in the Superior Court in Maricopa County in November, 2000.

The Plaintiffs seek injunctive relief by means of special action against the Governor, Jane Dee Hull, and the Attorney General, Janet Napolitano. The Plaintiffs name the State of Arizona as a defendant to preserve their right to attorneys' fees in the event they prevail. Richard Romley, the County Attorney for Maricopa County, is named so that in the event the court grants the Plaintiffs' alternative form of relief—an injunction against criminal prosecution—such relief may be effective. Romley has not actively participated in this litigation. It should be understood that where the court refers to "the Defendants," the State and its officers (and not Romley) are intended, unless otherwise noted.

The Plaintiffs requested that the case proceed on an accelerated basis. The Plaintiffs alleged that the Defendants were in the course of negotiating new or modified gaming compacts with Indian tribes, and that if compacts were concluded, the case would not be able to go forward. Accordingly, they believed expeditious treatment of their claims was necessary. The judge in the Superior Court granted the request.

All Defendants removed the matter on December 15, 2000. Notice of Removal (doc. # 1). The case was assigned to United States District Judge James A. Teilborg. On January 14, 2001, Judge Teilborg permitted Tucson Greyhound Park, Inc., to intervene as a plaintiff pursuant to a stipulation by the parties (doc. # 12). Judge Teilborg recused himself on January 16, 2001, and the case was reassigned to United States District Judge John W. Sedwick. On January 26, 2001, Judge Sedwick recused himself. At that time, the matter came before this court.

On February 1, 2001, the court held a preliminary scheduling conference, at which time the Plaintiffs reiterated their desire for a ruling on the merits on an expedited basis. The Defendants asserted that potentially dispositive motions should be heard first. Shortly thereafter the court announced a briefing schedule. The parties were required to file dispositive motions and/or trial briefs, responses and replies prior to the trial. It was understood that a hearing on the motions and the trial would be held on same day.[1]

Since then, the court has approved a consent preliminary injunction submitted by the parties pursuant to a written stipulation. Order of February 16, 2001 (doc. # 53). The injunction prohibits the Defendants from entering any new, modified, or renewed gaming compacts until disposition of this case.

Several dispositive motions are now before the court. They are: Defendants' Motion to Dismiss (Justiciability) (doc. # 49), Defendants' Motion to Dismiss for Failure to Join Indispensable Parties (doc. # 28), Defendants' Motion to Dismiss Amended Complaint for Failure to Join Indispensable Parties (doc. # 50), and Plaintiffs' Motion for Summary Judgment (doc. # 46). The court heard oral argument on the motions on April 12, 2001, at

---

**1.** Two additional motions to intervene as plaintiffs were filed, the first by George A. Rice and the Arizona Greyhound Association (doc. # 7), and the second by the Pima County Horsemen's Association, Inc., Arizona Quarter Racing Association, Arizona Thoroughbred Breeders Association, Cochise County Fair Association and Arizona Horsemen's Benevolent and Protective Association, Inc. (doc. # 11). Many of the associations represent suppliers or trainers of racing animals; two horse racing permittees are also included. The court denied the motions to intervene on February 9, 2001, because the alleged injuries are derivative of the injuries to the racetrack Plaintiffs, and their interests are adequately defended by the Plaintiffs. The court granted these would-be intervenors the opportunity to participate as amici.

which time it took the matter under advisement. Also on April 12, 2001, the court took evidence and held a trial on the merits. The Joint Statement of Facts (JSOF) submitted by the parties includes a stipulation that all the exhibits are admissible, although the parties do not stipulate to their relevance and reserve the right to challenge the relevance or materiality of any fact or document at any point in these proceedings. For purposes of this order, all the exhibits are part of the record.

## II. Factual Background

Beginning in 1993, Arizona governors have entered into gaming compacts with tribes. Am. Compl. ¶ 10. Tribal gaming in Arizona is governed by the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. §§ 2701 *et seq.*, and by state law, which IGRA incorporates by reference. IGRA establishes three classes of gaming. Class I includes social games for prizes of minimal value and traditional forms of Indian gaming. 25 U.S.C. § 2703(6). Class II includes bingo and certain card games. *Id.* § 2703(7)(A). Class III is the default category, capturing any games not falling into classes I or II. *Id.* § 2703(8). Slot machines and blackjack are types of class III gaming, *see id.* § 2703(7)(B) (excluding such games from Class II), and so is keno, a house banking game, *see* 25 C.F .R. § 502.4(2). Tribes must reach a compact with the state where tribal lands are located in order to operate class III gaming on those lands. 25 U.S.C. § 2710(d).

Under Arizona law, the Governor has authority to negotiate the terms of compacts on behalf of the State. *See* A.R.S. § 5–601. In the event negotiations fail, the Governor must enter into a standard form compact with any tribe wanting to sign on to its terms. A.R.S. § 5–601.01. Seventeen of the twenty-one recognized tribes in Arizona have entered into compacts, all on substantially similar terms.

*See* Motion to Dismiss (doc. # 28), Hart Aff. ¶ 4.

The compacts authorize specific types of class III gaming, including slot machines, keno, lotteries, off-track pari-mutuel wagering, and pari-mutuel wagering on horse and dog racing. Ex. A to Hart Aff. (Salt River Pima–Maricopa Indian Community/State of Arizona gaming compact) § 3(a). Each compact provides for automatic renewal after the initial term. Hart. Aff. ¶ 5. Specifically, the typical duration clause reads:

(1) This Compact shall be in effect for a term of ten (10) years after the effective date.

(2) The duration of this Compact shall thereafter be automatically extended for terms of five (5) years, unless either party serves written notice of nonrenewal on the other party not less than one hundred eighty (180) days prior to the expiration of the original term of this Compact or any extension thereof.

Salt River Pima–Maricopa compact § 23(b). The termination clause provides:

This Compact may be voluntarily terminated by mutual agreement of the parties, or by a duly adopted ordinance or resolution of the Tribe revoking the authority to conduct Class III gaming upon its lands, as provided for in 25 U.S.C. § 2710(d)(2)(D).

*Id.* § 23(c). The enforceability clause provides in relevant part:

(2) In the event that federal law changes to prohibit the gaming authorized by this Compact, the State may seek, in a court of competent jurisdiction, a declaration that this Compact is invalid.

(3) This Compact shall remain valid and enforceable against the State and the Tribe unless or until it is held to be invalid in a final non-appealable judg-

ment or order of a court of competent jurisdiction.

*Id.* § 23(d).

These compact terms form the basis of the relationship between the State and tribes engaged in gaming. The Defendants admit that "the Governor is considering the possibility of executing renewed, amended compacts" to take effect when current compacts expire in 2003. Answer ¶ 5 (doc. # 72). The Defendants maintain that renewal negotiations between the State and the Indian tribes were initiated in December 1999 by the tribes, *id.*, and are presently underway. They have included discussions about slot machines and blackjack. *Id.* Apparently longer compact terms have also been contemplated, for the Governor disputes the Plaintiffs' suggestion that her authority is limited to compacts for terms not exceeding ten years. *Id.* ¶ 12.

The Plaintiffs and Intervenor claim they do not intend to disturb the existing compacts. Rather, they express alarm at the prospect of renewal of the existing compacts or execution of new compacts. They contend that they have been injured by the advent of slot machine, keno and poker gaming on Indian reservations. Am. Compl. ¶ 15. The Plaintiffs are concerned by the possibility that the State could increase the concentration of gaming on the reservations. *Id.* ¶¶ 13, 15. They foresee a "massive expansion and extension in quantity and types" of tribal gaming. *Id.* ¶ 44. The Plaintiffs predict that heightened competition from tribal gaming will lead to their demise. *Id.* ¶ 15. Accordingly, they seek to enjoin the State from pursuing these negotiations and from concluding new compacts. *Id.* ¶ 6.

To this end, the Plaintiffs argue that renewed or new compacts along the lines contemplated by the State would be illegal under federal and state statutory law and in violation of state and federal constitutional norms. Specifically, they contend that the Governor lacks authority to execute compacts authorizing slot machine, keno and blackjack gaming. *Id.* ¶¶ 18–19. They allege that the Governor would invade the province of the legislature if she were to enter into compacts that allow tribes to conduct gaming activities that are otherwise prohibited by state statutes. *Id.* ¶ 21. They assert that such compacts would also violate the federal Indian Gaming Regulatory Act (IGRA), 18 U.S.C. § 1166, 25 U.S.C. § 2710(d), and 25 U.S.C. § 2710(d)(6). Plaintiffs also believe that the compacts unlawfully treat Indian tribes differently than non-Indians. *Id.* ¶¶ 25–29. For these reasons, they ask the court to prohibit the Governor from entering renewed compacts. *Id.* at 12. They recognize that effective relief would require the Governor to give affirmative notice that the State will not renew the compacts, which, under the terms of the compacts, must be tendered at least 180 days before the date of expiration. *See* Response (doc. # 65) at 1.

In the event the court rejects their arguments that the proposed compacts are illegal, the Plaintiffs wish to be afforded the same gaming privileges as the tribes. *Id.* ¶ 6. They envision this remedy taking the form of an injunction against criminal prosecution, for if the Plaintiffs were to engage in the kinds of gaming that the State is allegedly about to condone for the tribes, the Plaintiffs would be subject to prosecution. *Id.* ¶¶ 32–33. Defendant Romley's duty to enforce state gambling prohibitions is the reason for his inclusion in this lawsuit.

The Defendants contend that this matter is not justiciable for a number of reasons. As questions going to the court's jurisdiction and justiciability are logically resolved prior to the merits, the court shall address the Defendants' Motions to Dis-

miss first. The court shall address the Plaintiffs' Motion for Summary Judgment in the context of its findings of fact and conclusions of law at trial.

## SYNOPSIS

Due to the complexity of this order, and thus its length, the court believes it is appropriate to provide a synopsis. Engrossing legal issues have been presented; in particular, the interplay of federal and state law is very unusual. On issues of both federal and state law, the case breaks fresh ground. The Plaintiffs and Intervenor advance several theories why they should prevail, while the Defendants assert that not only should the Plaintiffs and Intervenor not prevail, but also that the court does not have the authority to decide the dispute.

The Defendants argue that the court lacks the power to decide this case because the Plaintiffs do not have the attributes necessary for them to be parties; in other words, that they lack standing. To the contrary, the Plaintiffs have demonstrated that they have a real and immediate problem, and that their position could be materially improved by a favorable ruling here. Thus, the court determines that it has authority to decide the core issues of the Plaintiffs' case, and that no jurisdictional defect precludes it from reaching the merits.

The Defendants also contend that representatives for the tribes in Arizona must participate in this case. In rejecting this argument, the court emphasizes that the issues before it concern the limits of the powers of the State and its officers. The court must decide what these limits are, and whether the Defendants' planned actions go beyond them. Accordingly, the court finds the tribes are not indispensable parties to this litigation in its present form, not because the issues are not important to them, but because adjudication of the issues does not require their presence.

■■■■ One of the limits on the State and its officers arises from the division of Arizona government into three branches; simply put, each branch has unique duties that cannot be taken over by the two other branches. Under the separation of powers doctrine, no other branch can usurp the power of the legislative branch. Under the non-delegation doctrine, which complements the separation of powers doctrine, the legislative branch cannot delegate its power to make law to another branch. The legislature may, however, delegate to other branches the duty to make rules to carry out a purpose fixed by the legislature. The legislature must supply the "intelligible principle" behind every law. If the legislature purports to enact a law like a blank check, leaving some other branch to create a rationale and then carry it out, such an arrangement violates the non-delegation doctrine.

The Plaintiffs and Intervenor argue that the Arizona statute authorizing the Governor to negotiate and enter compacts violates the non-delegation doctrine. They complain that the Governor is enabled to unilaterally create gaming policy within the State. She could take the position that very little gaming should take place on tribal land, or she could take the position that a great deal of gaming is desirable. Either position could be based on nothing more than the Governor's whim. Whatever position the Governor takes, however, the citizens of Arizona are committed once compacts are executed. After due consideration, the court holds that decisions about what kinds of gaming should be legal in Arizona and what kinds of gaming the State should agree to permit within its boundaries pursuant to tribal-State compacts are legislative decisions. Ariz.Rev. Stat. § 5–601 delegates this lawmaking

power to the Governor without conveying even a germ of policy to guide the Governor's discretion. Since A.R.S. § 5–601 violates article III of the Arizona Constitution and is void, the Governor is not enabled to enter compacts. The Governor's inability to enter compacts may readily be cured by the Arizona Legislature with the enactment of an appropriate delegation of compact authority.

Assuming that the Governor could enter compacts, the Plaintiffs argue those compacts cannot include terms for slot machine, keno or blackjack gaming. The parties have disputed whether such gaming is permitted under state law, and whether games have to be legal in Arizona before being included in a compact. The court finds that Arizona law does not permit slot machine, keno or blackjack gaming at charity casino nights or under other circumstances. Outside the social and amusement gambling contexts, the only gambling permitted under Arizona law must be conducted as a raffle. Federal law does not permit the State to enter compacts authorizing tribes to engage in gaming otherwise prohibited by state law. Therefore, even if A.R.S. § 5–601 were valid, the Governor could not properly enter compacts for games of chance other than raffles.

Finding A.R.S. § 5–601 unconstitutional is sufficient to convey to the Plaintiffs and Intervenor the principal relief they seek. The Plaintiffs do not prevail on their attempt to sue under the federal Indian Gaming Regulatory Act (IGRA), 25 U.S.C. §§ 2701 *et seq.*, their "local or special law" argument, their equal privileges claim, or their federal Equal Protection theory. The Intervenor prevails only on its nondelegation theory; its arguments that compacts are unlawful because they are treaties, legislation subject to tribal approval, or contracts impinging on the State's reserved powers are all rejected.

## DISCUSSION

### I. Justiciability

■ The Defendants move for dismissal of the first three of the Plaintiffs' claims.[2] They maintain that the Plaintiffs lack standing to challenge future compacts currently under negotiation. They further submit that IGRA does not authorize private causes of action. Resort may not be had to state law remedies, the Defendants argue, because IGRA occupies the field of regulation of tribal gaming, thereby preempting state claims. Finally, the Defendants argue that the State of Arizona must be dismissed because claims against

---

**2.** Plaintiffs' first three claims are: (1) the statute delegating to the Governor authority to enter into compacts, A.R.S. § 5–601, does not authorize compacts that include forms of gaming prohibited by state law—to the extent the Governor plans to make compacts with such terms, she exceeds her statutory authority, Am. Compl. ¶¶ 18–19; (2) if the legislature did delegate authority to the Governor to enter compacts permitting games of chance otherwise prohibited by state law, such an act would violate the separation of powers doctrine established by Ariz. Const. Art. III, *id.* ¶ 21; and (3) if the Governor entered compacts authorizing slot machine and related gaming, the compacts "would violate Arizona law because they would be ineffectual under and prohibited by [IGRA]," *id.* ¶ 23.

The court has had difficulty ascertaining whether the third claim asserts a claim for relief under IGRA or state law. From Plaintiffs' Response to the Motions to Dismiss (doc. # 65), the court assumed that the Plaintiffs intended to cast the third claim as a violation of state law, presumably A.R.S. § 5–601, which refers to IGRA, which in turn incorporates state law. At oral argument, however, Plaintiffs' counsel indicated that the third claim should be understood as an "IGRA cause of action." The court shall address both readings of Plaintiffs' third claim, for the Defendants briefed the IGRA cause of action theory in their Motion to Dismiss and had the opportunity to brief the state law theory in their Reply.

it are barred by the Eleventh Amendment. The Defendants state that their motion is made pursuant to Fed.R.Civ.P. 12(b)(6).[3]

## A. Standing

■ Article III standing requires a plaintiff to demonstrate three elements. The plaintiff must show (1) injury in fact, or an injury that is concrete and particularized and actual or imminent; (2) causation, or that the injury is "fairly traceable" to the challenged action; and (3) redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). For purposes of ruling on a motion to dismiss for want of standing, the court must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party. *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1178 (9th Cir.2000).

The Defendants challenge the Plaintiffs' assertion of the first and third elements, and also recommend dismissal pursuant to the prudential "zone of interests" doctrine.

In response, the Plaintiffs contend that standing is not necessary to maintain this action, but they also assure the court they have it. *Sua sponte*, the court also questions the Intervenor's standing to assert a constitutional contract theory.[4]

### 1. Imminent Injury/Ripeness

■ The Defendants contend that the Plaintiffs do not have an imminent injury. The actual injury requirement of Article III standing, by excluding hypothetical and indefinite injuries, overlaps with the justiciability doctrine of ripeness, which requires a live and immediate controversy. *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138–39 (9th Cir. 2000) (en banc). Whereas the "imminent injury" requirement of Article III standing deals with the proximity of harm generally, the ripeness doctrine looks exclusively at the vector of time. *See id.* at 1138. Standing thus bears "close affinity" to the ripeness issue of whether the harm asserted has "matured sufficiently to warrant judicial intervention." *Warth v. Seldin*,

---

3. While the Defendants' motion to dismiss for lack of Article III standing is brought pursuant to Rule 12(b)(6), the court notes that such a motion may be properly brought under Rule 12(b)(1) as well. *See Medina v. Clinton*, 86 F.3d 155, 157 (9th Cir.1996). There is some authority for the proposition that a challenge to standing may be brought under either 12(b)(1) or 12(b)(6). *See Simon v. Value Behavioral Health, Inc.*, 208 F.3d 1073, 1082 (9th Cir.), *as amended* 234 F.3d 428 (9th Cir. 2000), *cert. denied* —— U.S. ——, 121 S.Ct. 843, 148 L.Ed.2d 723 (2001) (affirming Rule 12(b)(6) dismissal for lack of standing); *accord Cohen v. Stratosphere Corp.*, 115 F.3d 695, 703 (9th Cir.1997); *but see Bland v. Fessler*, 88 F.3d 729, 732 n. 4 (9th Cir.1996) (stating that standing challenges must be brought under 12(b)(1) in the Ninth Circuit).

The consequences of a Rule 12(b)(6) determination are different from a Rule 12(b)(1) determination. *See Morgan v. United States*, 958 F.2d 950, 954 n. 1 (9th Cir.1992)(B.Fletcher, J. dissenting) (noting

that a Rule 12(b)(6) adjudication operates as a decision on the merits). The Supreme Court has strongly indicated that a decision about Article III standing is a jurisdictional decision and not a decision on the merits. *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 109, 118 S.Ct. 1003, 1020, 140 L.Ed.2d 210 (1998). Because the court would approach the motion in the same way regardless which subsection of Rule 12 the Defendants cited, *see Graham v. FEMA*, 149 F.3d 997, 1001 (9th Cir.1998), it is unnecessary at this juncture to do more than note the issue.

4. Specifically, the Intervenor contends that compacts purport to bind the police power of the State, such that the State could not effect more restrictive regulation of gaming, should it choose in the future to do so. Opening Brief (doc. # 43) at 5. The Intervenor argues that the State cannot lawfully commit itself by contract to an abdication of its sovereign power.

422 U.S. 490, 499 n. 10, 95 S.Ct. 2197, 2205 n. 10, 45 L.Ed.2d 343 (1975). The Ninth Circuit analyzes the constitutional and prudential concepts of ripeness separately. *See Thomas,* 220 F.3d at 1138–41.

### a. *Constitutional element*

■ For Article III purposes, a plaintiff must have suffered an "injury in fact" to a legally protected interest that is both "concrete and particularized" and "actual or imminent," as opposed to "conjectural" or "hypothetical." *Lujan,* 504 U.S. at 560, 112 S.Ct. at 2136. The point of this inquiry is to find truly adversarial parties with a genuine stake in the outcome of the litigation, and to ensure that the case does not extend the court beyond the role constitutionally allotted to the federal judiciary. *Spencer v. Kemna,* 523 U.S. 1, 11, 118 S.Ct. 978, 985, 140 L.Ed.2d 43 (1998).

■ The mere existence of an allegedly unconstitutional statute does not satisfy the injury-in-fact requirement. *Thomas,* 220 F.3d at 1139. Application of the statute must be threatened so as to put a plaintiff's rights in genuine peril. *Id.* When the "asserted threat is wholly contingent upon the occurrence of unforeseeable events," *id.* at 1141, the complaint must be dismissed.

■ Once events have transpired on which immediate legal consequences rest, however, such as the passage of a rule requiring immediate compliance, " '[o]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough.' " *Thomas v. Union Carbide Agric. Prods. Co.,* 473 U.S. 568, 581, 105 S.Ct. 3325, 3333, 87 L.Ed.2d 409 (1985). It follows that legal questions that may be decided without significant factual development are more likely to be ripe. *Freedom to Travel Campaign v. Newcomb,* 82 F.3d 1431, 1434 (9th Cir. 1996).

■ Ripeness is necessarily a fact-intensive inquiry. For example, a breach of contract lawsuit is not ripe until it becomes certain that the contractual obligation will not be honored. *Clinton v. Acequia, Inc.,* 94 F.3d 568, 572 (9th Cir. 1996). A civil rights suit to enjoin enforcement of a law is not ripe until there is a "genuine threat of imminent prosecution." *Thomas,* 220 F.3d at 1139. The certainty that the statute or rule will be applied is important, for "[t]he degree of contingency is an important barometer of ripeness." *Riva v. Commonwealth of Massachusetts,* 61 F.3d 1003, 1011 (1st Cir.1995); *see also Neal v. Shimoda,* 131 F.3d 818, 825 (9th Cir.1997) (if parole is conditioned on a statutory requirement, among other things, inmates may challenge the statute even if they have not yet satisfied other conditions).

### i. Plaintiffs' challenged claims

■ In this case, the Defendants characterize the Plaintiffs' asserted injury as speculative because it would result, if at all, from future compact-renewal actions by state and federal officials. They argue that "[u]nless, and until, new compacts are executed, the Plaintiffs cannot know the harm they may, or may not incur." Motion (doc. # 49) at 4. They also suggest that economic harm from future competition is speculative, because competition is inherently risky and success in business necessarily unpredictable. At oral argument, the Defendants submitted that a judgment here would be merely advisory because no one knows what state law will be at the time of compact execution.

In response, the Plaintiffs argue that they are already competing with the tribes and already suffering, so the economic effects of tribal competition are certain. Response (doc. # 65) at 11. Their expert calculates that they lose about $20 million

annually to "illegal" competition from the tribes. The expert predicts that if Indian gaming is expanded as proposed, such losses will rise more than 30 percent to about $26 million per year. The Plaintiffs expect that if the Governor enters ten-year compacts on expanded terms, their total loss will reach $250 million. If the Plaintiffs prevail, and the Governor notifies the tribes that the State will not renew the compacts, the Plaintiffs anticipate their ten-year revenues to increase by $200 million.

At oral argument, the parties agreed that the Plaintiffs suffer some quantifiable injury from tribal gaming. Although the parties do not agree about the extent of the Plaintiffs' damage, they correctly observe that this detail is irrelevant. The dispute centers on whether the Plaintiffs' injury is sufficiently immediate before the precise terms of future compacts—if any—are known.

The Governor has three options before her: she can renew the compacts on the existing terms, modify those terms and renew, or give notice of intent not to renew. The Plaintiffs assert injury to them is likely if the Governor does anything other than cancel the compacts. The Governor has participated in compact renewal negotiations, and she has agreed not to enter renewed compacts only for the period until the court rules. Once the Governor signs new compacts, it is undisputed (for the purposes of this motion, at least) that Plaintiffs' claims become nonjusticiable.

It is true that the existence of new compacts is contingent upon execution, and their terms cannot be known with certainty until consummation. Conceivably, the court could require the Plaintiffs to interpose their claims between the time negotiators reach an agreement on compact terms and the time the Governor signs the compacts. Such a requirement could be facilitated by an injunction preventing the Governor from executing proposed compacts. At that instant, the terms of the future compacts and prevailing state law would be known.

The court does not believe that delaying adjudication until that instant would materially ripen the issues, however. The Plaintiffs' claims address the power of the Governor to agree to slot machine, keno and blackjack gaming. The challenged terms are known with specificity, and it is undisputed that the Governor has considered them. The Governor has not disclaimed the possibility of executing compacts on the terms negotiated. A decision whether to execute negotiated compacts is imminent. Indeed, the parties have stipulated that "[u]nless barred by Court order, the Governor intends to negotiate in an effort to reach an agreement on modified or new compacts to be executed before the end of her term." JSOF (doc. # 75) ¶ 58. The questions before the court are overwhelmingly legal in nature and any needed factual development occurred at the trial phase of the hearing. If, under existing law, the Governor cannot enter compacts including certain terms, nobody profits by spending more time negotiating over them.

To the extent that the Defendants suggest that the Governor could refuse to enter compacts regardless how far negotiations progress, this possibility does not destroy jurisdiction. Under the Arizona statutes, it always remains possible that the Governor will decide not to sign a negotiated agreement. Her discretion over compact negotiation and execution is unrestricted. What is guaranteed is that whether the Governor enters a compact or not, her decision on the compacts will be taken pursuant to an allegedly unlawful grant of authority.

Furthermore, adopting the Defendants' distinction between negotiating and enter-

ing compacts would create an artificial fissure contrary to IGRA. Federal law provides that "the State shall negotiate with the Indian tribe in good faith to enter into such a compact." 25 U.S.C. § 2710(d)(3)(A). IGRA anticipates that compacts will be negotiated in consideration of state law and then become effective. The court finds the Plaintiffs' challenges pointed and immediate, and holds that they satisfy the Article III component of standing.

ii. Intervenor's reserved powers claim

The Intervenor's claim that compacts would contract away the State's police power is not ripe for Article III purposes. The Intervenor suggests that compacts bind the State to a particular exercise of the legislative power, or limit its power to legislate. Am. Compl. ¶ 18; Opening Brief (doc. # 43) at 5. For the reasons that follow, the court lacks jurisdiction to entertain such a claim.

States may act either in a sovereign capacity or as contractors. *See United States v. Winstar Corp.*, 518 U.S. 839, 896, 116 S.Ct. 2432, 2465, 135 L.Ed.2d 964 (1996) (plurality opinion). When a state enters into a contract, it is ordinarily governed by the same law generally applicable to contracts between private individuals. *Id.* at 895, 116 S.Ct. at 2464–65 (quoting *Lynch v. United States*, 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434 (1934)). The contracting parties remain subject to subsequent legislation by the sovereign, including legislation that might obstruct or alter the contractual bargain, for which the government as contractor may not be held liable. *Horowitz v. United States*, 267 U.S. 458, 461, 45 S.Ct. 344, 69 L.Ed. 736 (1925) (describing the sovereign acts doctrine). The government creates an exception to this presumption when, in the contract, sovereign power is "surrendered in unmistakable terms." *Winstar*, 518 U.S. at 872, 116 S.Ct. at 2453

(quoting *Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 52, 106 S.Ct. 2390, 2397, 91 L.Ed.2d 35 (1986)).

Pursuant to the reserved powers doctrine, some sovereign powers cannot be ceded even if the contractual intent to do so is patently clear. *See Atlantic Coast Line R. Co. v. Goldsboro*, 232 U.S. 548, 558, 34 S.Ct. 364, 368, 58 L.Ed. 721 (1914). For example, states cannot contract away their police powers. *Id.; Stone v. Mississippi*, 101 U.S. 814, 25 L.Ed. 1079 (1879) (holding that a company granted a state charter to conduct a lottery was not immune from subsequent legislation prohibiting lotteries).

The reserved powers doctrine comes into play when state liability is asserted for governmental actions that interfere with performance of a contract with the state. When a state takes on contractual duties, and the regulatory landscape later changes, the state may consider itself barred from honoring its prior agreement. If the party on the other side of the breach sues, the state can defend its actions by asserting that it could not guarantee performance of the contract in the face of changing law, due to the essential nature of the governmental powers that would be constrained. Courts decide whether the earlier government had the capacity to bind future legislatures and executives, and/or whether the later legislation extricated the state from its contract. Resolution turns on whether holding the state to its commitment would "strip" the government of its "core" legislative powers. *Winstar*, 518 U.S. at 889 & n.34, 116 S.Ct. at 2462 & n.34.

Here, the Intervenor encounters three problems. First, it is unclear that the proposed compacts would include a conveyance or abrogation of state police

power. The court anticipates that any compact terms making inroads on the State's police power will be subtle. In the absence of certain compact terms, the court cannot render an opinion about their forecast effect.[5]

Second, even if the compact terms were known and could only be construed to cede the State's police power, no conflict arises unless and until the Arizona legislature amends state gambling laws. As long as the compacts adhere to existing law, whether they obstruct future law-making poses a merely hypothetical problem.

 Third, assuming that a reserved-powers problem were ripe, the Intervenor has no standing to enjoin the State. A citizen's interest in conforming a state's actions to law is not enough, by itself, to confer standing. *See Allen v. Wright*, 468 U.S. 737, 754, 104 S.Ct. 3315, 3326, 82 L.Ed.2d 556 (1984). The Intervenor does not have a direct or particularized injury resulting from the alleged surrender of state police power. Accordingly, the court dismisses the Intervenor's sovereign acts claim for lack of constitutional standing.

b. *Prudential element*

 To evaluate the prudential concept of ripeness, the court considers (1) whether the issues are fit for judicial decision, and (2) whether the parties will suffer hardship if the court declines to consider the matter. *San Diego County Gun Rights v. Reno*, 98 F.3d 1121, 1132 (9th Cir.1996). The various factors that enter into a court's assessment of fitness include: whether the claim involves uncertain and contingent events that may not occur as anticipated or at all; the extent to which a claim is bound up in the facts; and whether the parties to the action are sufficiently adverse. *Philadelphia Fed'n of Teachers v. Ridge*, 150 F.3d 319, 323 (3rd Cir.1998). Issues that defy the fashioning of a narrow, case-specific holding are also unfit for judicial decision. *See Texas v. United States*, 523 U.S. 296, 301, 118 S.Ct. 1257, 1260, 140 L.Ed.2d 406 (1998) (refusing to offer an opinion that a state statute could never be applied in violation of federal law); *see also Thomas*, 220 F.3d at 1141 (requiring a "concrete factual scenario" demonstrating how a challenged law violates the plaintiffs' rights).

 The challenges brought here by the greyhound and horse racing industries take place in the context of a genuine dispute about the forms of gambling allowed under state law. The adversary stance of the parties is well established. The Defendants have not persuaded the court that any pertinent factual issues remain for development, nor has the court identified any. As noted above, the issues are principally legal: whether Arizona statutes authorize the Governor to enter compacts with terms for operating slot

---

5. Without taking a position as to whether there is a true conflict or not, the court notes that the compacting parties may have to reconcile the State's inability to unilaterally amend compacts with the Arizona statute forbidding compacts to circumscribe state sovereignty.

Assuming that tribal-state compacts are analogous to interstate compacts, a state's ability to exercise its police power after entering a compact may be constrained. Later changes in state law cannot be grounds for reneging on a compact between states. *See West Virginia ex rel. Dyer v. Sims*, 341 U.S. 22, 30–31, 71 S.Ct. 557, 562, 95 L.Ed. 713 (1951). As a consequence, interstate compacts limit the ability of state legislatures to respond to changing preferences and circumstances. *See* Jill Elaine Hasday, *Interstate Compacts in a Democratic Society: The Problem of Permanency*, 49 Fla. L.Rev. 1, 8–9 (1997). However, A.R.S. § 5–601(A) explicitly instructs the Governor not to "waive, abrogate or diminish" the state's sovereignty, of which police power can be viewed as a critical attribute.

machines, whether state statutes cede legislative power to the Governor, and whether state law requires the Governor to conclude compacts within the strictures of IGRA. "Whether [a] statute delegates legislative power is a question for the courts," *Whitman v. American Trucking Ass'n*, 531 U.S. 457, 121 S.Ct. 903, 912, 149 L.Ed.2d 1 (2001), and that issue and others are properly presented here.

Deferring adjudication would cause the Plaintiffs hardship: If a dispute over compact terms is premature before the Secretary's approval, afterwards litigation cannot proceed, for then the tribes would be absent, indispensable parties. Indeed, the Defendants are already arguing that the tribes are indispensable on the theory that the Plaintiffs' claims affect the tribes' rights under the existing compacts. While the Plaintiffs could perhaps still bring claims against the State for relying on unconstitutional state laws, the problem of redressability at that juncture would likely be insuperable. The court finds declining jurisdiction on prudential grounds unwarranted.

### 2. Redressability

The Defendants argue that even if the Governor were enjoined from entering gaming compacts with tribes, it is "highly likely" that tribal gaming will continue. In arguing the futility of relief, the Defendants rely on an analogy to *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). *Lujan*'s observation that the intervening actions of non-parties may prevent effective redress does not control here.

In *Lujan*, the plaintiffs challenged environmental regulations proposed by the Secretary of the Interior. 504 U.S. at 558, 112 S.Ct. at 2135. The regulations would have limited the applicability of the Endangered Species Act (ESA) to domestic activities of federal agencies. *Id.* at 559, 112 S.Ct. at 2135. The plaintiffs wanted federal agencies funding development in foreign countries to observe the ESA. *Id.* at 562, 112 S.Ct. at 2137.

As an alternate ground for denying standing, the plurality wrote that even if the proposed rule were changed, it was an "open question" whether the agencies would be bound by it. *Id.* at 568, 112 S.Ct. at 2140.[6] Because the agencies were not parties to the plaintiffs' lawsuit, they would not be obliged "to honor an incidental legal determination." *Id.* at 569, 112 S.Ct. at 2141. The plurality further assumed that if required to comply with the ESA, federal agencies would withdraw funding for projects. It found no indication that projects would not go forward despite the withdrawal of federal funds, so it assumed that the environmental harm feared by Plaintiffs would nevertheless be inevitable. *Id.* at 571, 112 S.Ct. at 2142. Plaintiffs lacked standing because it was "conjectural" whether winning relief against the Secretary of the Interior would alter or affect the activities of the non-party federal agencies or prevent environmental damage. *Id.*

The Defendants here argue that "[l]ike the agencies who were not parties to the *Lujan* litigation, the Indian tribes who conduct Indian gaming are not parties here and would not be bound by any dis-

---

**6.** Under the Endangered Species Act, federal agencies are required to involve the Secretary of the Interior in their development plans. 16 U.S.C. § 1536(a)(2). The plurality suggested that the agencies "arguably" had "initial responsibility" to determine whether they were required under the statute to involve the Secretary in their plans. *Id.* at 568–69, 112 S.Ct. at 2141. From this grant of interpretive discretion, it followed that the agencies could decide their projects never required them to consult the Secretary and thus could avoid committing to the regulations.

trict court determination concerning their activities on sovereign tribal ground." Motion at 5. The Defendants foresee ongoing tribal gaming for three reasons: (1) the current compacts provide for automatic renewal for a 5–year term; (2) in the absence of compacts, federal law permits the tribes to conduct class III gaming with the approval of the Secretary of the Interior, see 25 U.S.C. § 2710(d)(7)(B)(vii); and (3) the tribes could engage in "uncompacted gaming," which only the federal government can contain, and then, allegedly, only with difficulty.

In response, the Plaintiffs point out that: (1) one vein of relief sought is an order requiring the Governor to send notice of non-renewal, defusing the automatic renewal clause; (2) uncompacted class III gaming is a federal felony offense, 18 U.S.C. § 1166; and (3) the federal government has effective means to prevent it. They also argue that the Secretary of the Interior cannot approve class III gaming in violation of a judgment here that such gaming is prohibited to all persons in Arizona. The Plaintiffs contend that the prospect that the tribes might continue class III gaming without a compact does not undercut their interest in ensuring the Governor follows proper procedures. Response at 20 n.12.

The Defendants do not raise the automatic renewal clause again in reply. Instead, they write that it cannot be assumed that the Plaintiffs will obtain redress from an order here if uncompacted tribal gaming is the ultimate result. Reply (doc. # 67) at 4. They argue that the relevant enforcement authority (presumably the U.S. Attorney or some other agent of the federal government) "is not a party here and is not bound by this Court's interpretation of IGRA or Arizona law." Id. In a footnote, the Defendants question the Plaintiffs' reliance on precedents involving claims to enforce procedural rights, which,

the Defendants argue, have a lower redressability threshold. They characterize the Plaintiffs' claims as a challenge to the State's "substantive ability through its Governor to compact for certain types of games under IGRA." Reply (doc. # 67) at 4 n.3.

■■■■ A plaintiff must demonstrate redressability for each form of relief sought. *Friends of the Earth v. Laidlaw Environmental Serv.*, 528 U.S. 167, 185, 120 S.Ct. 693, 706, 145 L.Ed.2d 610 (2000). It is not necessary for judicial relief to inevitably cure the asserted injury; rather, redress need only be *likely*, or more than "merely speculative." *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130. The procedural-opportunity theory of standing posits injury when an executive or administrative agency has failed to comply with its governing procedures. 13 Charles R. Wright, Arthur R. Miller and Edward H. Cooper, *Federal Practice and Procedure* § 3531.4 at 433 (2d ed. 1984 & Supp.2000). It is not necessary to show that the final agency decision would have been different; it is enough to raise the possibility that had the agency observed required procedures, it would have considered its decision differently. *Id.* A substantive injury, on the other hand, arises when someone is ordered to do or refrain from doing something; a formal legal license, power, or authority is granted, modified or withheld; someone is subjected to civil or criminal liability; or legal rights or obligations are created. *See Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733, 118 S.Ct. 1665, 1670, 140 L.Ed.2d 921 (1998).

■■■ The court finds that for the purposes of surviving a motion to dismiss, the Plaintiffs have sufficiently alleged redressability. The first and third claims are substantive and must be held to substantive standards, but the second is a procedural injury and the procedural notions of redress apply.

On the first claim, set out *supra* at 1030 n. 2, it is likely that if the court held that the Governor lacks authority under A.R.S. § 5–601 to offer slot machine, keno and blackjack gaming in the new compacts, she would not conclude new compacts on such terms. Executive actions taken in excess of law are *ultra vires*. Besides, the Plaintiffs want the court to enjoin the Governor from entering the compacts, a remedy that would further decrease the likelihood that the Governor would proceed.

On the second claim, if the court held that the Governor lacks authority to enter any compacts because of a problem with the enabling statute A.R.S. § 5–601, it is likely that new compacts will not be entered pursuant to those statutes. This inability would not be the end of the story, of course. The Arizona Legislature might attempt to cure any defects with the statute, or it might do nothing and compel tribes to obtain class III gaming permits through the federal administrative process. Either way, invalidating the statute would force a reexamination of state compacting processes by Arizona's political bodies. The Plaintiffs might not carry the debate, but they would prevail by obtaining a public airing of their views.

On the third claim, the Plaintiffs seek to improve their competitiveness by limiting the tribes to the varieties of gaming that the Plaintiffs are allowed. Preventing the tribes from engaging in blackjack, keno and slot machine gaming could very well end the alleged competitive imbalance. *Cf. Washington v. Daley*, 173 F.3d 1158, 1165 (9th Cir.1999) (holding that the redressability requirement is met when a judicial determination would effectively transfer the tribal allocation of a resource to competing nontribal claimants). At this early stage, it is not "mere speculation" to believe that if the court rejects the Defendants' argument about the breadth of gaming lawful in Arizona, and about what IGRA permits states to do, the gaming extended to the tribes by state compacts will be restricted.

The possibility that redress will be derailed by actions of the Secretary of the Interior or the tribes is unpersuasive. *Lujan* cautions against making assumptions about the independent actions of non-parties. The Ninth Circuit has held it error to pre-judge the outcome of an administrative proceeding and summarily conclude that no redress is obtainable. *See Tyler v. Cuomo*, 236 F.3d 1124, 1133 (9th Cir.2000). The court may not pre-judge the outcome of a consultation by the Secretary of the Interior with the tribes pursuant to 25 U.S.C. § 2710(d)(7).

In fact, there is good reason to believe that the Defendants are incorrect in predicting that the Secretary would annul any relief the Plaintiffs might win here. Assuming that the State revises its view of its gambling laws following a decision here and tribal-State negotiations fail, it is unclear that the Secretary would entirely override the State's position. *See* 25 U.S.C. § 2710(d)(7)(B)(vii)(I) (the Secretary must prescribe regulations for gaming consistent with relevant state law). Regulations binding on the Secretary expressly provide that proposals are to be consistent with state law, and contemplate extensive involvement by state officials. *See* Class III Gaming Procedures, 25 C.F.R. Part 291 (2000).[7] If a gaming proposal is not

---

7. If a tribe attempts to sue a state for failure to enter a compact and is rebuffed by the state's assertion of Eleventh Amendment immunity, the tribe may submit a proposal to the Secretary of the Interior. 25 C.F.R. § 291.3. Upon receiving the proposal, the Secretary forwards copies to the state's Governor and Attorney General for comments on whether the proposed gaming activities are permitted to any person for any purpose in the State, and whether the proposal is other-

consistent with state law, and if the gaming proposed is not permitted in the State for any purposes by any person, organization, or entity, the proposal may be rejected. 29 C.F.R. §§ 291.8(b), 291.11(b). Thus, in the event that the Plaintiffs obtain a favorable ruling on what Arizona law permits, it is likely that this relief will be preserved in subsequent administrative proceedings.[8]

Just as the court will not speculate about the future decisions of the Secretary of the Interior, in the event that the tribes are faced with a choice of no gaming or uncompacted gaming, the court may not assume that the tribes will hazard uncompacted gaming. After all, the compacts will not begin to expire for another two years, during which time it is conceivable that some resolution can be reached. Likewise, whether a settlement can be reached or not, the court may not assume that federal authorities will decline to enforce federal law if it is violated by the tribes.

In sum, it is likely that if the court adopts the interpretation of state law that the Plaintiffs propose, the choices of independent parties will be circumscribed by that interpretation, even if those parties are not legally bound by this adjudication. Unlike *Lujan*, where the plaintiffs' standing argument fell apart because non-parties had no obligation to take actions necessary for relief, here, the Secretary of the Interior, the tribes and federal law enforcement officers have obligations preexistent to and distinct from this lawsuit that would serve—not thwart—a remedy.

The court finds the Defendants' reliance on two district court cases from the Fifth Circuit unpersuasive. In holding that plaintiffs had not established redressability, these courts found that the requested relief would only delay and not prevent Indian gaming. See *Willis v. Fordice*, 850 F.Supp. 523, 534 (S.D.Miss.1994), aff'd 55 F.3d 633 (5th Cir.1995); *Langley v. Edwards*, 872 F.Supp. 1531, 1534 (W.D.La. 1995), aff'd. 77 F.3d 479 (5th Cir.1996). The *Willis* court relied on a pre-IGRA Supreme Court case to suggest that tribes have an absolute right to engage in class III gaming. It specifically did not consider whether class III Indian gaming would be inevitable under IGRA. See 850 F.Supp. at 529 n. 7.[9] It is now abundantly clear that tribes may lawfully conduct class III gam-

---

wise consistent with relevant state law. *Id.* § 291.7.

If the state elects to submit an alternate proposal, the two competing proposals are presented to a "mediator," who must choose one. *Id.* § 291.10. The Secretary may disapprove the proposal selected by the mediator for a number of reasons, including that the chosen provision contemplates gaming activities not permitted in the state or is not consistent with state law. *Id.* § 291.11.

If the State does not propose an alternative, the Secretary reviews the tribe's proposal for compliance with state law. *Id.* § 291.8(a). Then the Secretary either approves the proposal or convenes tribe and state officials to discuss any unresolved issues. *Id.* § 291.8(b). Following the conference, the Secretary may either set forth a proposal as a final decision, or reject the proposal due to unresolved is-

sues, including nonconformity with state law. *Id.* § 291.8(c).

8. Moreover, because the validity of a state compact is a distinct issue that is not mooted by Secretarial approval, *see Santa Ana v. Kelly*, 104 F.3d 1546, 1555 (10th Cir.1997), compact validity under state law is justiciable regardless of the possibility of later Secretarial action pursuant to federal law.

9. Since *Willis* also found that the plaintiffs alleged no injury in fact, 850 F.Supp. at 528, and would lose on the merits besides, *id.* at 534, it is impossible to surmise that the Fifth Circuit approved the redressability analysis when it affirmed. *Langley* follows *Willis* closely and offers no analysis to support its conclusion that class III Indian gaming is inevitable under IGRA. See 872 F.Supp. at 1534.

ing only pursuant to a valid compact, 25 U.S.C. § 2710(d)(1)(C), whether negotiated directly with the State or through the intervention of the Secretary. It is entirely possible that state law may block tribal plans to engage in certain kinds of class III gaming, depending on how IGRA is construed. The court rejects the approach taken in these opinions as inconsistent with Ninth Circuit law.

## B. *Zone of interests*

■ The Defendants argue that the Plaintiffs do not fall within the "zone of interests" regulated by IGRA. The Plaintiffs respond that as competitors of entities regulated by IGRA, their claims are within the zone of interests. They also contend that the Defendants misapprehend the nature of their claims. They maintain they raise state law claims that implicate IGRA but do not depend on IGRA for a cause of action. The Plaintiffs thus imply but do not state directly that delimiting IGRA's zone of interests is unnecessary here. In light of the varying characterizations of the Plaintiffs' third claim and their response to the merits of this argument, the court shall discuss the "zone of interests" theory, to the extent that the third claim rests on an implied cause of action under IGRA.

■ Even when a plaintiff satisfies Article III's standing requirements, a prudential rule requires that the plaintiff's complaint fall within "the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Valley Forge Christian College v. Americans United for Separation of Church & State,* 454 U.S. 464, 475, 102 S.Ct. 752, 760, 70 L.Ed.2d 700 (1982). The prudential zone of interests doctrine is used to establish whether a plaintiff has a federal cause of action; that is, whether a particular plaintiff has a right to judicial enforcement of a legal duty of the defendant. *See*

William A. Fletcher, *The Structure of Standing,* 98 Yale L.J. 221, 237, 252 (1988).

In order for the zone of interests doctrine to bar a plaintiff with an actual injury and with Article III standing: (1) the plaintiff must not be the subject of the challenged statute, and (2) the plaintiff's interests must be "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Securities Industry Ass'n,* 479 U.S. 388, 399, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987). The test is permissive and allows standing so long as it is "arguable" that the plaintiff's interests are within the zone covered by the statute. *Id.* "[T]here need be no indication of congressional purpose to benefit the would-be plaintiff." *Id.* at 399–400, 107 S.Ct. at 757.

When a would-be plaintiff competes with entities directly regulated by the statute in question, it has repeatedly been held that the zone of interests test is satisfied. *See National Credit Union Administration v. First National Bank & Trust ("NCUA"),* 522 U.S. 479, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998); *Clarke,* 479 U.S. at 403, 107 S.Ct. 750; *TAP Pharmaceuticals v. U.S. Dep't of Health and Human Serv.,* 163 F.3d 199, 208 (4th Cir.1998); *Mova Pharmaceutical Corp. v. Shalala,* 140 F.3d 1060, 1074 (D.C.Cir.1998); *American Fed'n of Gov't Employees, Local 2119 v. Cohen,* 171 F.3d 460, 469 n.4 (7th Cir.1999). For example, competitors of financial institutions have standing to challenge an agency action relaxing restrictions on the activities of those institutions. *NCUA,* 522 U.S. at 488, 118 S.Ct. at 933. In *NCUA,* commercial banks were permitted to challenge a rule that allowed federal credit unions to expand membership eligibility. Commercial banks had an interest in minimizing the market share of credit unions, and that interest "arguably" fell within the statute.

*Id.* at 494–95, 118 S.Ct. at 936. That the statute limiting credit union membership was apparently intended to promote the cooperative nature and financial soundness of credit unions—not to shelter commercial banks—was deemed irrelevant. *Id.* at 498, 118 S.Ct. at 938.

■ While the competitor standing rule is reasonably clear, the zone of interests doctrine has been generally described as "malleable." *See* 13 Charles Alan Wright, et al., *Federal Practice and Procedure* § 3531.7 at 726 (Supp.2000). It originated as a way to interpret the broad grant of standing in the Administrative Procedure Act (APA), at 5 U.S.C. § 702. *See Clarke,* 479 U.S. at 399, 107 S.Ct. at 757 (1987) (construing *Ass'n of Data Processing Serv. Org., Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)). The zone of interests is not a test of universal application. *See id.* at 400 n. 16, 107 S.Ct. at 757 n. 16. Indeed, the Supreme Court's most recent discussions of the zone of interests test could be read to limit its relevance to cases arising under the APA or similar statutes with broad provisions for the public to challenge the actions of federal agencies. *See NCUA,* 522 U.S. at 488–93, 118 S.Ct. at 933–35 (1998); *Federal Election Commission v. Akins,* 524 U.S. 11, 19, 118 S.Ct. 1777, 1783, 141 L.Ed.2d 10 (1998) (construing zone of interests protected by Federal Elections Campaign Act). The possibility that the zone of interests test is not particularly useful to analyze causes of action outside the administrative or citizen suit context has been expressly recognized by the Third Circuit. *See Conte Bros. Automotive v. Quaker State–Slick 50, Inc.,* 165 F.3d 221, 226 (3d Cir.1998); *see also* 13 Charles A. Wright, et al., *Federal Practice & Procedure* § 3531.7 at 823 (Supp.2001).

On the other hand, the zone of interests doctrine may bear on all cases arising under federal law. *See Bennett v. Spear,* 520 U.S. 154, 117 S.Ct. 1154, 1162, 137 L.Ed.2d 281 (1997) ("Congress legislates against the background of our prudential standing doctrine, which applies unless it is expressly negated."). The Ninth Circuit has recently engaged in a "zone of interests" analysis regarding a claim without administrative or citizen-suit characteristics. *See San Xavier Development Authority v. Charles,* 237 F.3d 1149 (9th Cir. 2001). In *San Xavier,* the lessee of an Indian tribe attempted to assert statutory rights only a tribe can assert. *See id.* at 1152. Specifically, in attempting to disentangle itself from obligations to a sublessee, the plaintiff (a tribe's lessee) argued that the sublease was void because it violated the requirement that leases be approved by the Secretary of the Interior, and it ignored a statutory constraint on alienation of tribal trust lands. *See id.* at 1152–53. The Ninth Circuit held that a non-Indian lessor does not have the right to invoke statutory remedies enacted to protect Indian tribes and their members. *Id.* at 1153. Thus, it used "zone of interests" language to determine that the plaintiffs had no federal cause of action under the statute they sought to invoke.

Informed by *San Xavier,* it is apparent that the Defendants assert a zone of interests argument because they conceive the Plaintiffs' claims as arising under IGRA. The Defendants argue that IGRA recognizes only three legal interests—those of compacting States, tribes, and the Secretary of the Interior—and that the balancing act IGRA represents should not be upset by allowing a suit by interests unprotected by the scheme.

The court acknowledges the dangers of meddling with IGRA's integrated statutory scheme. *See United States v. Spokane,* 139 F.3d 1297, 1299 (9th Cir.1998) (deciding whether invalidation of one part of IGRA requires limiting the applicability of

a counteracting provision). It is not apparent, however, how IGRA will be distorted by the Plaintiffs' efforts to enforce IGRA's regulations on tribal gaming. The status of the Plaintiffs as competitors of the tribes regulated by IGRA gives them an interest in enforcing IGRA's terms. Considering that plaintiffs "need only show that their interests fall within the 'general policy' of the underlying statute, such that interpretations of the statute's provisions or scope could directly affect them," *Graham v. FEMA*, 149 F.3d 997, 1004 (9th Cir.1998), the court finds that the Plaintiffs' interest "arguably" satisfies the zone of interest requirement of prudential standing.

■■■ Moreover, it is preferable to determine whether IGRA contemplates suits by private-party competitors in the context of a motion to dismiss for failure to state a claim, and not in the process of making an initial determination of standing. Whether the Plaintiffs have a claim under IGRA depends on how IGRA is construed; that is, whether it is construed to contain an implied right of action. At this juncture, the court is unable to find that the assertion of an implied cause of action is so totally meritless as to deprive the court of subject matter jurisdiction to even consider the matter. *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 89, 118 S.Ct. 1003, 1010, 140 L.Ed.2d 210 (1998). Therefore, the Defendants' motion to dismiss for lack of standing is denied. Finding that the Plaintiffs have standing, it is unnecessary to reach the Plaintiffs' claim, *see* Response (doc. # 65) at 4, that they may sue state officials without having a special or particularized interest in the result.

### C. *Eleventh Amendment*

The Defendants argue that the State of Arizona should be dismissed as a defendant because there are no claims against the State as a separate entity, and if there were, such claims are barred by the Eleventh Amendment. In response, the Plaintiffs explain that they seek relief against state officers and have joined the State to assure execution of a fees judgment. The Plaintiffs anticipate an award of attorneys' fees under the common fund/common benefit doctrine, the private attorney general doctrine,[10] and 42 U.S.C. § 1988. Am. Compl. ¶¶ 39–45. The Plaintiffs argue that the Eleventh Amendment does not bar an award of attorneys' fees, but if it did, the State has waived its sovereign immunity by removing this action to federal court.

At oral argument, the parties agreed to table this issue until after the court rules on the other motions. The court shall reserve the matter for another day.

### II. Failure to Join Indispensable Parties

■■■ The Defendants argue that the action must be dismissed because the Plaintiffs have failed to join the Indian tribes, who are alleged to be indispensable parties. On a motion to dismiss pursuant to Rule 12(b)(7), the court must first decide whether an absent person should be joined. Fed.R.Civ.P. 19(a); *see* 5A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1359 (2d ed. 1990 & Supp.2001). If the absent party is necessary, the court then considers whether it can be joined. *Quileute Indian Tribe v. Babbitt*, 18 F.3d 1456, 1458 (9th Cir.1994). If the absent person should be

---

**10.** The private attorney general doctrine is an equitable rule that permits courts to award attorneys' fees to a party who has vindicated a right that: (1) benefits a large number of people; (2) requires private enforcement; and (3) is of societal importance. *Arnold v. Dep't of Health Serv.*, 160 Ariz. 593, 775 P.2d 521, 538 (1989).

joined but is unavailable, the court must then determine, by balancing the guiding factors set forth in Rule 19(b), whether the absent party is "indispensable" so that in "equity and good conscience" the action should be dismissed. *Id.* The moving party bears the burden of showing the nature of the unprotected interests of the absent persons. *Makah Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th Cir.1990). Adjudicating a Rule 12(b)(7) motion is a fact-intensive and flexible inquiry. *Id.* Facts may be presented in the form of affidavits and other relevant extra-pleading evidence. *McShan v. Sherrill*, 283 F.2d 462, 464 (9th Cir.1960).

## A. Necessary Parties

Under Rule 19(a)(1), the court begins by considering whether complete relief can be afforded to those already party to the action in the absence of the unjoined parties. *Quileute*, 18 F.3d at 1458. If not, then the tribes are considered necessary parties. *Id.* at 1459; *Clinton v. Babbitt*, 180 F.3d 1081, 1088–89 (9th Cir.1999). If the answer is yes, however, the court must then determine under Rule 19(a)(2) whether the absent party has a legally protected interest in the subject of the action that might be compromised by a disposition. *Makah*, 910 F.2d at 559.

### 1. Availability of complete relief

■ The Defendants characterize the Plaintiffs' suit as a challenge to the terms of existing compacts, particularly to the automatic renewal provision. Motion (doc. # 28) at 5; Motion (doc. # 50) at 3. The Defendants argue that as a matter of law, all parties to an agreement are necessary to adjudicate an attack on its terms, citing *Clinton*, 180 F.3d at 1088, and *Kescoli v. Babbitt*, 101 F.3d 1304 (1996). According to the Defendants, the tribes have a legally protected interest in the compacts to which they are parties, and should be joined if

litigation on the terms of the existing compacts is to go forward.

The Plaintiffs dispute the Defendants' description of their claims. The Plaintiffs contend that they seek "only to confine the Governor within the law in renewing, administering, or modifying the compacts or in making new compacts." Response at 22. The Plaintiffs expressly challenge only prospective compacts that would go into effect no earlier than 2003. The Plaintiffs maintain that since the Governor has unilateral power to not renew the compacts, and the tribes have no protectable interest in the State's renewal determination, the tribes are not necessary parties.

■ The court begins with the legal proposition that compacts are treated like contracts. *Confederated Tribes of Siletz Indians v. Oregon*, 143 F.3d 481, 484–85 (9th Cir.1998); *Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546, 1556 (10th Cir.1997). When rights under a contract are litigated, all parties to the contract are necessary parties in order to afford complete relief. *See Clinton*, 180 F.3d at 1088 (citing *Lomayaktewa v. Hathaway*, 520 F.2d 1324, 1326 (9th Cir.1975)). The Defendants compare this case to *Clinton* and argue that the Ninth Circuit has already answered the questions before the court. Whether Defendants are correct depends on the similarity of the material facts.

In *Clinton*, the terms on which Navajo Nation members would reside on Hopi Partitioned Lands (HPL) were at stake. 180 F.3d at 1083. Congress attempted to resolve the differences between Navajos wanting to live on Hopi land (HPL Navajos) and the Hopi Tribe by enacting the Navajo–Hopi Land Dispute Settlement Dispute Act of 1996. The 1996 Act ratified a settlement between the United States and the Hopi Tribe, whereby the Hopi Tribe agreed to allow HPL Navajos to remain on their land under the terms of

75–year leases. *Id.* at 1085. A standard lease was negotiated by the Hopi Tribe, the Navajo Nation, and representatives of the HPL Navajos. *Id.* at 1085. The standard lease terms were embodied in an Accommodation Agreement among these parties. *Id.* at 1085. The Secretary of the Interior was required to approve each lease written according to the standard terms. *Id.* at 1086. Plaintiffs, HPL Navajos who disagreed with the terms of the standard lease, sued the Secretary to block his approval of any leases. *Id.* They also sought a declaratory judgment that the 1996 Act was unconstitutional. *Id.*

On the Rule 19(a)(1) prong, the Ninth Circuit summarily held that no complete relief could be granted without the Hopi Tribe. The panel held that jurisdiction over the parties to the agreement was necessary to adjudicate its terms, but it did not specify which agreement was to be adjudicated by the plaintiffs' lawsuit. 180 F.3d at 1088. Because the lease terms were part of the Accommodation Agreement concluded among the Hopi Tribe, the Navajo Nation, and the representatives of the HPL Navajos, it appears that on the Ninth Circuit's logic, both the Hopi Tribe and the Navajo Nation were necessary parties. The other agreement in play was that between the Secretary and the Hopi Tribe. If, as a result of the litigation, the Secretary were prevented from approving the leases, but was obliged to make payments to the Hopi Tribe after the approval of a number of leases, the Secretary would face inconsistent obligations. The Secretary would be obliged to pay valuable incentives to the Hopi Tribe for entering leases, but it could not approve any leases. Either of these possibilities would support the Ninth Circuit's holding that no complete relief could be granted without the Hopi Tribe. *See Manybeads v. United States*, 209 F.3d 1164, 1165 (9th Cir.2000), *cert. denied* —— U.S. ——, 121 S.Ct. 1504, 149 L.Ed.2d 388 (2001) (in a related case, explaining that the Hopi Tribe is necessary because it is party to the agreement with the Secretary and the Accommodation Agreement).

■■■ Not every case where an agreement figures is controlled by the rule described in *Clinton*, however. If a litigation does not concern the obligations under an existing contract, either because the litigation is about something other than the contract or because the relief sought would have effect only after the contract ends, complete relief may be available with the absent contracting party. As an example of the first exception, if a non-party raises a procedural challenge to an agency determination that a certain tract constitutes "tribal land," the tribe claiming an interest in the land is not necessary to render complete relief vis-à-vis the agency. *See Kansas v. United States*, 249 F.3d 1213, 1226–27 (10th Cir.2001); *see also Sac and Fox Nation of Missouri v. Norton*, 240 F.3d 1250, 1258 (10th Cir.2001) (propriety of actions by the Secretary of the Interior can be ascertained without tribe); *Yellowstone County v. Pease*, 96 F.3d 1169, 1173 (9th Cir.1996) (whether tribal court had jurisdiction to interpret a state statute did not require presence of tribe).

■■■ Prospective relief, the second exception noted here, effects changes only going forward and does not undermine existing obligations.[11] For example, procedural claims raised by the Makah Tribe against the Secretary of Commerce in *Makah Indian Tribe v. Verity*, 910 F.2d 555, 559 (9th Cir.1990) sought prospective relief. There, the Secretary was responsible for adopting salmon harvest quotas. *Id.* at

---

11. Assertions that only prospective relief is sought must be viewed critically. Some so-called prospective relief would, if granted, disturb the rights of absent parties under existing contracts. *See Kescoli,* 101 F.3d at 1310.

557. The Makah Tribe challenged its low allocation by alleging that the Secretary had violated the APA and the Fishery Conservation and Management Act when he adopted the quotas. *Id.* The Ninth Circuit held that these claims could go forward without the other tribes that had received allocations, because the Makah sought relief that would "affect only the future conduct of the administrative process," and "all of the tribes have an equal interest in an administrative process that is lawful." *Id.* at 559.

In this case, the relief sought is prospective and raises largely procedural concerns, thereby making *Clinton* distinguishable. The narrow issue before the court concerns the Governor's authority to enter future compacts and on what terms. An authoritative interpretation of state law is the relief that the Plaintiffs seek. The Plaintiffs do not seek to change the State's duties or rights under the existing compacts, but rather challenge how the State decides what duties or rights are appropriate for prospective compacts.

If, in this case, the court were to enter judgment in favor of the Plaintiffs on the separation of powers claim, the procedure by which the Governor could renew or negotiate new compacts would be altered. Conversely, if the court were to enter a judgment in favor of the Defendants, the State could proceed to renew or modify the class III gaming compacts as the Governor sees fit. On the Plaintiffs' substantive claims, concerning the terms that the Governor may agree to, the Governor's negotiating hand is established by state law. Complete relief would involve only a change in the position of the State apart from its obligations under existing compacts. The court concludes that the tribes need not be joined under Rule 19(a)(1) because complete relief can be accorded among the Plaintiffs and Defendants in their absence.

### 2. Legally protected interest

Under Rule 19(a)(2), the question is whether the tribes have a legally protected interest in the process by which compacts are renewed or the terms of renewal. *Makah,* 910 F.2d at 558; *Stock West Corp. v. Lujan,* 982 F.2d 1389, 1398 (9th Cir.1993).

■ The Defendants again stress similarities to *Clinton.* There, in discussing Rule 19(a)(2), the Ninth Circuit held that the absent Hopi Tribe's interests were likely to be impaired for three reasons. 180 F.3d at 1088. First, if the Secretary could not approve the standard form lease, the Hopi Tribe would not be able to fulfill its commitment to the United States to enter leases with the HPL Navajos. *Id.* at 1089. Second, the 1996 Act offered valuable incentives to the Hopi Tribe if it entered large numbers of such leases. If the Hopi Tribe could not enter standard leases, it could not qualify for these statutory benefits. *Id.* Third, under the standard leases, the Hopi Tribe obtained jurisdiction over the leased land in exchange for allowing the HPL Navajo to live on it. Hopi jurisdiction over HPL territory was viewed as essential for Hopi Tribe members and HPL Navajo to coexist peacefully. *Id.* Without the leases, the Hopi Tribe would have no mechanism to secure jurisdiction over its territory.

Whether *Clinton* controls here hinges on how the tribes' interest in the compacts—both current and future—is conceived. The first question is whether rights under existing compacts are to be adjudicated. The court must determine whether the actions of the State that are being challenged here overlap with the actions that the State takes pursuant to the compacts. The next question is whether the tribes have an interest in the terms of future compacts that could be implicated by adjudicating this case.

 In light of the Ninth Circuit's position analogizing compacts to contracts, *see Confederated Tribes of Siletz Indians,* 143 F.3d at 484–85, principles of contract law apply. "[I]n the absence of a statutory or contractual right to renewal, a person ... can claim no property interest in the indefinite renewal of his or her contract." *Federal Lands Legal Consortium ex rel. Robart Estate v. United States,* 195 F.3d 1190, 1199 (10th Cir.1999) (on due process claim, discussing alleged property interest in grazing permits). When a right to terminate is exercised according to the conditions set out in the contract, the party losing profits expected under a renewed term does not suffer prejudice to a legally protected interest. *See Otis Elevator Co. v. George Washington Hotel Corp.,* 27 F.3d 903, 908–09 (3d Cir.1994). If the right to terminate is unconstrained, the ongoing existence of an agreement is merely speculative. It is well established that a legally protected interest cannot be wholly contingent. "Speculation about the occurrence of a future event ordinarily does not render all parties potentially affected by that future event necessary or indispensable parties under Rule 19." *Northrop Corp. v. McDonnell Douglas Corp.,* 705 F.2d 1030, 1046 (9th Cir.1983).

As set out on pages 1027–28, *supra,* the existing compacts provide for automatic five-year extensions unless either party serves written notice of non-renewal on the other. The only condition for an effective notice of non-renewal is that it be served at least 180 days prior to the expiration of the existing term. The Governor's right to serve notice of non-renewal is otherwise absolute. She can exercise for cause, or for no reason at all. It is probative that one point of negotiation has been whether, in future compacts, the State's right to prevent automatic renewal should arise only under certain conditions. *See* JSOF,

Ex. 58 (letter from a tribe's counsel proposing an automatic term of renewal that State may cancel only for a specified reason). Given the present unconstrained right of the Governor to terminate the existing compacts at the end of their initial term and to begin negotiations afresh, renewal on current or more favorable terms is only speculative.

When the Defendants argue that a judgment against the Governor would be a judicial rewriting of the automatic renewal clause of the compact, they ignore how that clause does not specify acceptable grounds for termination. Unlike *Clinton,* where the absent parties had vested rights under existing contracts, here, the tribes' interest in renewal is contingent on the Governor's exercise of limitless discretion. Because the compact does not limit the State's discretion to invoke the termination option, a federal injunction would appear to be as good a reason as any. Requiring the Governor to invoke the termination clause on the grounds that she lacks the authority to enter compacts would not disturb the tribes' contractual rights.

 *Shermoen v. United States,* 982 F.2d 1312, 1317 (9th Cir.1992), does not control here, because the dispute before the court there implicated vested rights of absent parties. The *Shermoen* opinion arose in a suit brought by several individual members of the Yurok Tribe for a declaration that a statute partitioning tribal land among the Yurok and Hoopa Valley Tribes was unconstitutional. The plaintiffs argued that the tribes were not necessary parties, because the partitioning statute was either constitutional or unconstitutional:

> [I]f the latter, then the absent tribes have no "legally protected interest in the outcome of the action"; if the former, then the appellants will not prevail and thus the disposition of the action will not impair the absent tribes' interests.

*Id.* at 1317. The Ninth Circuit rejected this logic, holding that the absent tribes were entitled to raise their legal theories and claims about the act allotting them partitioned land. To put it another way, the problem with the *Shermoen* plaintiffs' argument is that it prejudges the merits. If the act were unconstitutional, the absent tribes lacked a legally protected interest. If the act were constitutional, then the Tribes would have had a legally protected interest but no harm would be done by their absence because the statute would have been upheld. This kind of reasoning is contrary to Rule 19, which requires a determination whether there is a legally protected interest before the adjudication on the merits begins.[12]

Here, when the Plaintiffs challenge the Governor's ability to enter renewed compacts on certain terms, the Plaintiffs challenge the Governor's interpretation of state law. Before negotiations with the tribes may begin, the Governor must develop a negotiating position consonant with state law. This dispute over the limits of state law strikes at what the Governor will present to the tribes and what she can agree to, which are issues that must be resolved prior to the existence of compacts in which tribes have a legally protected interest. Simply put, the tribes have no legally protectable interest in the Governor's negotiating agenda.

While the court accepts as plausible the Defendants' assertion that granting the requested relief would "directly impact the tribes' ability to conduct gaming," the De-

fendants have not attempted to persuade the court that the tribes have a nonfrivolous claim to conduct more gaming than is allowed by state law. *See Rumsey Indian Rancheria of Wintun Indians v. Wilson,* 41 F.3d 421, 425 (9th Cir.) *as amended,* 99 F.3d 321 (9th Cir.1996) ("where a state does not 'permit' gaming activities sought by a tribe, the tribe has no right to engage in these activities...."). A verdict here in the Plaintiffs' favor would not implicate the rights IGRA guarantees the tribes.

To the extent that the tribes believe they have rights to conduct blackjack, keno and slot machine gaming that are not dependent on the limits of state law, the tribes' absence is unlikely to be prejudicial. The tribes may advance these non-state law rights in negotiations with the Secretary of the Interior to conduct class III tribal gaming. *See* 25 U.S.C. § 2710(d)(7)(B)(vii) (providing that Secretary shall prescribe terms for class III gaming where state has refused to consent to compact selected by count-appointed mediator); 25 C.F.R. Part 291 (providing for secretarial approval of class III gaming where state and tribe have been unable to agree on compact and state asserts sovereign immunity).

The Defendants raise the possibility that the State Defendants will be subject to inconsistent duties if relief is entered without the tribes. The Defendants note that the State is obliged to enter into the standard form compact with any tribe that requests it, pursuant to A.R.S. § 5-601.01(A).[13] They argue that an eligible

---

12. At this stage, Plaintiffs have only alleged that the existing compacts are illegal and that renewal would also be illegal. To the extent that those allegations prove correct, the court notes that no legally protectable interest can arise in an unlawful creation. *See United States v. San Juan Bay Marina,* 239 F.3d 400, 406 (1st Cir.2001).

13. A.R.S. § 5-601.01, which originated as a voter initiative, provides:

A. Notwithstanding any other law or the provisions of § 5-601, the state, through the governor, shall enter into the state's standard form of gaming compact with any eligible Indian tribe that requests it.

B. For purposes of the this section:

tribe not currently party to an existing compact could sue the Governor to compel her to enter into the standard form compact, the lawful renewal of which is challenged here.

■ This argument fails to persuade. First, the possibility that a tribe not yet party to a standard form compact might demand to enter one is hypothetical at this point. The theoretical possibility of another lawsuit cannot be the basis for dismissal under Rule 19(a)(2). *Northrop Corp.*, 705 F.2d at 1045; 7 Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, *Federal Practice and Procedure* § 1604 at 48 (3d ed.2001).

■ Second, the risk of inconsistent obligations arises not from the tribes' absence from this lawsuit but from ambiguity in the Arizona statute requiring the Governor to enter standard form compacts. When ambiguity is inevitable whether a suit proceeds or not, joinder of an absent party is not required. *See Southwest Center for Biological Diversity v. Babbitt*, 150 F.3d 1152, 1155 (9th Cir.1998). Tribes negotiating renewal are not entitled to the standard form compacts, for A.R.S. § 5–601.01 covers only tribes entering a compact for the first time and does not offer the standard compact terms as an alternative to a negotiated renewal, if the State opts against automatic renewal. In making their inconsistent obligations argument, the Defendants apparently assume that the Governor will be caught between a statutory obligation to offer the four tribes not yet parties to a compact the

terms of the compacts entered in 1993, and a finding that those terms are somehow illegal.

The court finds the alleged conflict does not defeat this lawsuit. The problem is that § 5–601.01 does not explain the obligation of the Governor in the event that the standard form compacts are found to violate state law. The Arizona Supreme Court expressly avoided taking a position about how the statute should operate in the event that the standard compact terms were declared unlawful. *See Salt River Pima–Maricopa Indian Community v. Hull*, 190 Ariz. 97, 945 P.2d 818, 823 n. 3 (1997). The Arizona Supreme Court held only that the State is required to offer the 1993 compact terms as a default. The issue the Defendants raise has been percolating since it was recognized by Vice Chief Justice Jones in 1997. *See Salt River Pima–Maricopa*, 945 P.2d at 826–27 (Jones, V.C.J., concurring). While § 5–601.01 may pose a dilemma for the Defendants, adjudicating the terms of renewal here does not create inconsistent burdens, but only exposes a flaw inherent in the statute.

Finally, it remains uncertain whether the Governor would in fact be subject to inconsistent obligations. To begin with, the standard form compact is intended as a default agreement should negotiations fail. It is mere speculation that negotiations with the tribes could not produce an agreement consistent with the Governor's obligations under state law or that the

---

1. The state's standard form of gaming compact is the form of compact that contains provisions limiting types of gaming, the number of gaming devices, the number of gaming locations, and other provisions, that are common to the compacts entered into by this state with Indian tribes in this state on June 24, 1993, and approved by the United States secretary of the interior on July 30, 1993.

2. An eligible Indian tribe is an Indian tribe in this state that has not entered into a gaming compact with the state. C. The state, through the governor, shall execute the compact required by this section within thirty days after written request by the governing body of an eligible tribe.

State will ever be bound to inconsistent judgments.

To illustrate, suppose that negotiations fail, the four tribes demand the standard form terms, and the State refuses, citing a ruling here. The tribes must sue an entity with sovereign immunity to enforce a different interpretation of A.R.S. § 5–601.01. Here, the Defendants minimize this obstacle, arguing that if they assert sovereign immunity, the Secretary of the Interior is likely to allow the tribes to continue conducting the same kinds of gaming presently allowed under the current contracts. Reply at 6–7. Their rationale is that the Secretary would want the tribes who entered compacts in 1993 to compete equally with the Salt River Pima–Maricopa Tribe, which entered a compact that will not expire until 2008. Yet even if the Secretary takes this course of action (a very speculative assumption), the compact would exist pursuant to federal and not state law, and thus not confront the State with inconsistency. Therefore, the risk that the Defendants will be confronted with irreconcilable obligations is remote.

■ Having concluded that the tribes are not necessary parties under Rule 19(a), further analysis is unnecessary. *Makah*, 910 F.2d at 559. In an abundance of caution, the court proceeds regardless. Assuming that the absent tribes are necessary, the next step is to determine whether the party can be joined. *Quileute*, 18 F.3d at 1458 (9th Cir.1994). The tribes are entitled to sovereign immunity and cannot be joined without their express consent. *Id.* at 1459; *Clinton*, 180 F.3d at 1090. The parties accept that the tribes will not consent, and there is no basis for second-guessing this assumption. The court next considers whether the action must be dismissed.

B. *Indispensable Parties*

The court weighs the following factors to determine whether absent parties are indispensable:

(1) to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties;

(2) the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided;

(3) whether a judgment rendered in the person's absence will be adequate;

(4) whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

Fed.R.Civ.P. 19(b); *Clinton*, 180 F.3d at 1090.

■ The Defendants argue that the tribes' immunity to suit should operate conclusively in favor of a finding of indispensability. The Ninth Circuit has noted that when the necessary party is immune from suit, there may be "very little need for balancing Rule 19(b) factors because immunity itself may be viewed as the compelling factor." *Quileute*, 18 F.3d at 1460 (quoting *Confederated Tribes of the Chehalis Indian Reservation v. Lujan*, 928 F.2d 1496, 1499 (9th Cir.1991)). Nevertheless, district courts must apply the four-part test to determine whether Indian tribes are indispensable parties. *See id.*

■ The first factor mirrors the impaired interest analysis of Rule 19(a)(2). *Kescoli*, 101 F.3d at 1311. Having found that the tribes are not affirmatively required to participate in this litigation under Rule 19(a)(1), the court finds that it is possible to go forward without them. With regard to the second factor, the parties have not suggested any specific ameliorative measures. The third factor concerning the adequacy of judgment is

closely related to the analysis under Rule 19(a)(1). 7 Wright, et al., *supra* § 1604 at 50. For the reasons discussed above, this factor does not support finding the tribes indispensable parties.

■ On the fourth factor, the fact that a plaintiff is left without a remedy is not particularly compelling one way or the other. *See, e.g., Imperial Granite v. Pala Band of Mission Indians*, 940 F.2d 1269, 1272 (9th Cir.1991); *Clinton*, 180 F.3d at 1090 (holding that other three factors may heavily outweigh this factor).[14] The Plaintiffs contend that they will have no other remedy if this action is dismissed. The Defendants note that any compact entered by the State and the tribes must be approved by the Secretary of the Interior, but it is agreed that the Secretary does not review compacts for compliance with state law. This factor, although regarded as little more than a makeweight in cases involving sovereign tribes, favors allowing this litigation to go forward.

Having weighed the four factors carefully, the court denies the Defendants' Motion to Dismiss for Failure to Join Indispensable Parties. It is unnecessary to reach the Plaintiffs' claim that their suit should proceed under the "public rights exception" to the indispensable party rule.

Were the tribes indispensable parties, however, the court does not believe that the Defendants' interests are sufficiently aligned to allow the State Defendants to represent the tribes. *Cf. Shermoen*, 982 F.2d at 1318. As the Defendants point out, the State and the tribes have been adversaries in a number of suits over gaming, and the State owes no trust obligation to the tribes. Although the Defendants acknowledge they have been in communication with counsel for certain tribes, their unwillingness to commit themselves to representing the interests of the absent tribes is significant.[15]

Finally, the Defendants assert and the Plaintiffs do not appear to dispute that the State's gaming policy has in the past shifted with each new governor. Ultimate resolution of this case may extend into the gubernatorial campaign season of 2002. Casting the Defendants as proxies for the tribes in this litigation is rife with potential for conflicts in representation. To best preserve all parties' interests and minimize the possibility of conflicts, the court rejects the Plaintiffs' suggestion that the Defendants would be adequate representatives for the absent tribes. No one has suggested that Rick Romley, the Maricopa County Attorney, should stand in for the tribes.

---

**14.** The result in *Comstock Oil & Gas, Inc. v. Alabama and Coushatta Indian Tribes*, 78 F.Supp.2d 589 (E.D.Tex.1999), is expressly predicated on a Fifth Circuit rule allowing joinder of tribal officials on the grounds they are not entitled to sovereign immunity. The Fifth Circuit and Ninth Circuit diverge on this point. *Id.* at 593. The court rejects *Comstock* as inapplicable.

**15.** At the trial, the court heard witness testimony which tended to rebut an inference the Plaintiffs sought to establish; namely, that the State and tribes are in league together to secure tribal gaming. The testimony related to efforts to amend Arizona gambling prohibitions, sponsored by the Arizona Department of Gaming (DOG). The Plaintiffs suspect that

the changes were intended to cement the Defendants' view that tribal gaming is legal. The court finds that the evidence does not support such an inference.

Paul Walker, formerly the legislative liaison and public information officer at DOG, first drafted the agency's proposed gaming amendments. He stated that the bill was meant to create a mechanism to regulate off-reservation charitable gaming. He denied that the bill was meant to have an impact on this litigation or on the Governor's power to enter tribal compacts. Rick Pyper, who assumed the legislative liaison job on January 1, 2001, confirmed that DOG had included tribal representatives in its efforts to promote the bill. He stated that DOG had not acquiesced to all of the tribes' suggestions, however.

Accordingly, none of the Defendants may be viewed as an adequate substitute for the tribes.

### III. Failure to State a Claim

Under Rule 12(b)(6), "dismissal for failure to state a claim is improper unless 'it appears beyond doubt that the plaintiff can prove no set of facts in support which would entitle him to relief.'" *Schowengerdt v. General Dynamics Corp.*, 823 F.2d 1328, 1332 (9th Cir.1987) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Thus, in undertaking its analysis, the court must limit its "review to the contents of the complaint, accepting the material factual allegations as true and construing them in the light most favorable to the [non-movant]." *Id.*

The Defendants maintain that to the extent the first three claims in the Plaintiffs' amended complaint and the first claim in Intervenor's amended complaint turn on alleged violations of IGRA, those claims must be dismissed because IGRA preempts state law claims based on alleged violations of federal law and it does not provide a private cause of action.[16]

### A. *Preemption of State Law Claims*

The Plaintiffs' state law causes of action are based on common law writs of injunction and prohibition guaranteed by the Arizona Constitution:

> The superior court or any judge thereof may issue writs of mandamus, quo warranto, review, certiorari, prohibition, and writs of habeas corpus on petition by or on behalf of a person held in actual custody within the county. Injunctions, attachments and writs of prohibition and habeas corpus may be issued and served on legal holidays and non-judicial days.

Ariz. Const. art. VI, § 18. The Plaintiffs argue that because they have "injury and standing," they are entitled to invoke the writs to restrain the State Defendants. The Defendants do not dispute the Plaintiffs' ability to state a claim by way of the writs. They also admit that claims brought under state law to compel compliance with state law would not be preempted. Reply at 10. However, they dispute the accuracy of the Plaintiffs' characterization of their claims. According to the Defendants, the Plaintiffs' claims are based on alleged violations of IGRA, and IGRA occupies the field regulating casino gaming within reservations.

IGRA entirely preempts state regulation which "interferes or is incompatible with federal or tribal interests as reflected in federal law." *Confederated Tribes of Siletz Indians v. Oregon,* 143 F.3d 481, 486 (9th Cir.1998). For claims involving non-tribal members, the court must determine "whether, in the specific context, the exercise of state authority would violate federal law." *Id.* (quoting *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 145, 100 S.Ct. 2578, 2584, 65 L.Ed.2d 665 (1980)).

For present purposes, the court asks "whether a particular claim will interfere with tribal governance of gaming." *Gaming Corp. of America v. Dorsey & Whitney,* 88 F.3d 536, 549 (8th Cir.1996). In *Gaming Corp.,* the Eighth Circuit held that state law claims "to challenge the outcome of an internal governmental decision by the nation" are preempted. *Id.* By contrast, "[p]otentially valid claims under state law are those which would not interfere with the nation's governance of gaming." *Id.* at 550. Thus, claims arising from duties independent of gaming, such as an attorney-client relationship between non-tribal parties, may not be preempted, depending on their specific facts. *Id.* State law claims that attack the process by

---

**16.** The Plaintiffs' first three claims are set out at note 2, *supra.*

which tribal decisions are made, by contrast, are extinguished. *Id.*

The Eighth Circuit recently elaborated on the distinction between preempted and unrelated claims. A contract that is "merely peripherally associated with tribal gaming" is not controlled by IGRA. *Casino Resource Corp. v. Harrah's Entertainment, Inc.*, 243 F.3d 435, 439 (8th Cir. 2001). No tribal interest is implicated in a breach of contract suit between two non-tribal would-be casino management companies. *Id.* Such a claim is not preempted because it arises from duties independent of tribal gaming regulation. *Id.*

The Ninth Circuit also construes the scope of IGRA preemption to permit state law claims if they are sufficiently tangential to gaming regulation. *See Confederated Tribes of Siletz Indians*, 143 F.3d at 484. There, the State of Oregon created a report of a police investigation of a tribal casino which, under the terms of the compact in effect, it was entitled to do. When media groups sought to obtain a copy of the report under Oregon's Public Record Laws, the tribe objected to disclosure. The terms of the compact expressly provided that information gathered by the State would be kept confidential to the extent provided under the Public Records Laws. *Id.* at 483. Under the compact, Oregon had to produce the report if the Record Laws so required. IGRA did not preempt the Public Records Laws because the Oregon statutes "do not seek to usurp tribal control over gaming nor do they threaten to undercut federal authority over Indian gaming." *Id.* at 487. The Court of Appeals found that any adverse consequence accruing to the tribe as a result of disclosure of the report was incidental and not inconsistent with IGRA. *Id.*

Here, the Plaintiffs seek "judicial supervision of the legality of State participation in the trilateral compacting process, not review of federal or tribal action." Response at 9. The Defendants' conclusory assertion that such claims interfere with "IGRA-apportioned responsibilities" and threaten tribal interests, Reply at 11, is inadequate. Under *Gaming Corp.,* the court must assess each claim separately to identify points of interference.

The court finds that the Plaintiffs do not seek relief that would interfere with tribal control over reservation gaming. As discussed above, *see* Part II.A *supra,* the Plaintiffs seek to ensure the legality of the terms to which the Governor proposes to commit the State and its citizens. The Governor's duty to negotiate compacts and the terms to which she may agree are set out in state law. State law questions about whether a state has validly bound itself to a gaming compact are not preempted. *Oneida Indian Nation of New York State v. County of Oneida,* 132 F.Supp.2d 71, 76 (N.D.N.Y.2000). IGRA preemption blocks the operation of state policy once a valid compact is executed, *see Cabazon Band of Mission Indians v. Wilson,* 124 F.3d 1050 (9th Cir.1997), but it gives effect to state policy through the compact negotiation process. 25 U.S.C. § 2710(d)(1)(B). The Plaintiffs' allegations that state officials' acts are illegal strikes at issues logically prior to the issues preempted by IGRA.

Moreover, to the extent congressional intent is the touchstone of field preemption, the court finds nothing to support an inference that the Plaintiffs' first three claims should be preempted. IGRA does not purport to govern the political processes whereby states' gaming policy is established. *See Coeur d'Alene Tribe v. Idaho,* 842 F.Supp. 1268, 1275 (D.Idaho 1994), *aff'd* 51 F.3d 876 (9th Cir.1995). To the contrary, IGRA creates a federal regulatory scheme that is sensitive to state preferences and idiosyncracies. Where a form of class III gaming is prohibited by a state, IGRA allows that prohibition to be extend-

ed to tribal gaming in the state. 25 U.S.C. § 2710(d)(1)(B). Therefore, to the extent that the Plaintiffs' first three claims rely on state writs to require the Governor to negotiate compacts within the confines of state law, the Defendants' motion to dismiss is denied. To the extent that the Plaintiffs' third claim purports to allege a cause of action under IGRA, such a claim must be rejected for the reason set described below.

## B. *Implied right under IGRA*

Only three kinds of entities are expressly given causes of action under IGRA— Indian tribes, States, and the United States. 25 U.S.C. § 2710(d)(7)(A). The Intervenor has claimed that while A.R.S. § 5–601 allows the Governor to enter compacts for forms of gaming permitted by IGRA, IGRA authorizes compacts to include only forms of gaming permitted by state law. It claims that under IGRA, the Governor cannot enter compacts authorizing slot machines and other games. Am. Compl. (doc. # 52) ¶¶ 15–16.[17] The court has alternatively construed the Plaintiffs' third claim to assert a similar IGRA claim. The question arises whether a private cause of action may be implied under IGRA.

■■■■■ A four-factored analysis is used to divine whether a private right of action is implicit in a statute:

(1) Is the plaintiff one of the class for whose benefit the statute was enacted— that is, does the statute create a federal right in favor of the plaintiff?

(2) Is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?

(3) Is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?

(4) Is the cause of action one traditionally relegated to state law, so that it would be inappropriate to infer a cause of action based solely on federal law?

*See Burgert v. Lokelani Bernice Pauahi Bishop Trust,* 200 F.3d 661, 664 (9th Cir. 2000) (quoting *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975)). The crux is whether Congress intended private enforcement of the statute. *Touche Ross & Co. v. Redington,* 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979). Such an inference is often drawn from statutory structure: a well-integrated remedial scheme deflects judicial implication of a private right of action. *See id.* at 571–72, 99 S.Ct. at 2487; *see also Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 73–74, 116 S.Ct. 1114, 1132, 134 L.Ed.2d 252 (1996) (holding that the "carefully crafted and intricate remedial scheme" of IGRA may not be supplemented with the judicially created remedy of the *ex parte Young* doctrine). The text of the statute and legislative history are also important. *Burgert,* 200 F.3d at 664.

■■■■ Stepping through the four-part analysis in this case would be superfluous, for the Ninth Circuit has already ruled that the only private causes of action under IGRA are those explicitly provided. *See Hein v. Capitan Grande Band of Diegueno Mission Indians,* 201 F.3d 1256, 1260 (9th Cir.2000). In *Hein,* the Court of Appeals rejected an attempt by a tribal splinter group to obtain an allocation of gaming proceeds as inconsistent with the "comprehensive regulatory scheme." *Id.* The Eleventh Circuit has interpreted IGRA similarly. *See Tamiami Partners v. Miccosukee Tribe of Indians,* 63 F.3d 1030, 1049 (11th Cir.1995) (gaming man-

---

17. The court has accepted the Plaintiffs' characterization of their first two claims as arising under state law. To the extent that they seek relief directly under IGRA, however, the following analysis is equally applicable.

agement company fails to state a claim against tribe for failing to issue license in violation of IGRA, because no implied right of action); *Florida v. Seminole Tribe of Florida,* 181 F.3d 1237, 1246 (11th Cir. 1999) (State may bring against tribe only those claims expressly recognized in IGRA).

Furthermore, the Ninth Circuit has refused to recognize a general cause of action to enforce IGRA. *Cabazon Band of Mission Indians v. Wilson,* 124 F.3d 1050, 1059 (9th Cir.1997)("*Cabazon III*"). When the State of California sought to enjoin certain class III tribal gaming alleged to have been conducted outside a compact, the Ninth Circuit rejected the attempt, because neither the terms of the compact nor IGRA allowed it. *Id.* at 1060.

The Plaintiffs cite a few cases that, they argue, recognize implied rights of action under IGRA. Response (doc. # 65) at 7 n.2. To the contrary, these cases discuss whether federal subject matter jurisdiction is established when compacts or contracts made pursuant to IGRA are alleged to be breached. In *Cabazon III,* 124 F.3d at 1056, the defendants disputed the existence of federal question jurisdiction over an action to enforce compact terms. The Court of Appeals held that because the contract was a tribal-state compact, the breach of contract claim arose under IGRA for jurisdictional purposes. *Id.; accord Tamiami Partners,* 63 F.3d at 1047; *cf. Iowa Management & Consultants, Inc. v. Sac & Fox Tribe,* 207 F.3d 488, 489 (8th Cir.2000) (holding that a management company's contract claim against tribe to enforce arbitration clause did not present a federal question).

■■ Because no private right of action can be implied under IGRA, the Intervenor's first claim for relief must be dismissed. The Plaintiffs' third claim, when construed as a claim alleging a violation of IGRA, is also dismissed. The Defendants' motion is granted on this point.

### C. *Conclusion*

To summarize, the court has eliminated causes of action purportedly brought under IGRA. It has also dismissed a claim by the Intervenor that compacts unlawfully contract away the State's police power. The claims grounded in state law shall be decided on their merits.

### IV. Summary Judgment and Trial Findings of Fact and Conclusions of Law

### A. *Background*

The court begins with a brief recitation of the recent history of tribal gaming in Arizona. This approach reflects the parties' briefing.

■■■ Congress enacted IGRA in October 1988, following the U.S. Supreme Court's decision in *California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987).[18] IGRA balances the interests of three kinds of sovereigns: the federal government, tribes, and states. The backdrop to IGRA is recognition that tribes are entitled to conduct gaming on tribal lands free of state regulation in states that permit gaming. Sen. Rep. 100–466 (reprinted in U.S.C.C.A.N. 3071, 3072)(describing *Cabazon,* 480 U.S. 202, 107 S.Ct. 1083 (1987)).[19]

**18.** In *California v. Cabazon Band of Mission Indians,* the Supreme Court held that tribes acting on tribal land are not subject to state civil regulations unless Congress expressly provides. 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987). As long as a state regulates and does not prohibit a particular gam-

ing activity, tribes may freely operate such games.

**19.** The parties have offered several items of IGRA's legislative history. They are the Senate Report, Congressional Record excerpts concerning the introduction of the Senate

While states lack authority to regulate tribal gaming, the federal government has plenary power to do so. *Id.* at 3073.

Congress made a number of findings, *e.g.*, recognizing that numerous tribes had become engaged in gaming; that existing federal law did not provide clear standards or regulations for the conduct of such gaming; that federal policy aims to promote tribal economic development, tribal self-sufficiency and strong tribal government; and that Indian tribes have an exclusive right to regulate gaming activity that is neither specifically prohibited by federal law nor the law of the surrounding state. 25 U.S.C. § 2701.

At the time IGRA was passed, no federal gaming regulator existed and Congress found it appropriate to rely mostly on state agencies. Sen. Rep. 100–466, *supra* at 3075. State agencies regulate tribal gaming only at the "affirmative election" of the tribes, however. *Id.* Tribes must invite state regulation if they wish to conduct class III gaming, for class III gaming may be conducted only pursuant to a compact. *Id.* at 3076.

IGRA controls state gaming regulation to prevent states from (1) sheltering non-tribal gambling, *see id.* at 3083, and (2) regulating class II gaming by tribes when class II gaming is otherwise permitted, *id.* at 3081–82. Apart from these conditions, Congress appears to have meant to depend on and defer to state mechanisms to achieve regulatory goals:

> States and tribes are encouraged to conduct negotiations within the context of the mutual benefits that can flow to and from tribe and States. This is a strong

and serious presumption that must provide the framework for negotiations. A tribe's governmental interests include raising revenues to provide governmental services for the benefit of the tribal community and reservation residents, promoting public safety as well as law and order on tribal lands, realizing the objectives of economic self-sufficiency and Indian self-determination, and regulating activities of persons within its jurisdictional borders. A State's governmental interests with respect to class III gaming on Indian lands include the interplay of such gaming with the State's public policy, safety, law and other interests, as well as impacts on the State's regulatory system, including its economic interest in raising revenue for its citizens. It is the Committee's intent that the compact requirement for class III not be used as a justification by a State for excluding Indian tribes from such gaming or for the protection of other State-licensed gaming enterprises from free market competition with Indian tribes.

*Id.* at 3083.

Pursuant to IGRA, in November 1988, the Yavapai–Prescott Indian Tribe asked the State of Arizona to enter a tribal gaming compact. *Yavapai–Prescott Indian Tribe v. State of Arizona*, 796 F.Supp. 1292, 1294 (D.Ariz.1992) (Rosenblatt, J.). When negotiations stalled over the kinds and quantity of gaming the State would agree to, the Yavapai–Prescott Tribe brought suit, with several other tribes participating as intervenors. *Id.* While a motion to dismiss the federal lawsuit was

bills 555 and 1303, Senate approval of S.555 and House approval of S.555, plus excerpts from a hearing before the Senate Select Committee on Indian Affairs. The statements of individual legislators printed in the Congressional Record as hearing testimony is not particularly illuminating. The Senate Report has been used by other courts and the legislative statements of intent there have largely been incorporated into judicial opinions. The court will refer to the Senate Report when appropriate but shall not consider the other materials further.

pending, the then-United States Attorney for the District of Arizona authorized the seizure of several hundred gaming machines from tribal casinos. A fracas ensued. *See* JSOF Ex. 6 (Ben Winton, "Symington offers gambling pact," Phoenix Gazette A–1, 12 (May 29, 1992)).

On July 1, 1992, the Arizona legislature enacted what became codified as A.R.S. § 5–601, authorizing the Governor, on behalf of the State, to negotiate and execute compacts pursuant to IGRA. A statement of intent was enacted as well as the operative statutory text. *See* JSOF Ex. 7 (H.B. 2352, 1992 Ariz. Sess. Laws ch. 286).[20] On July 3, 1992, the Governor entered a compact with the Yavapai–Prescott tribe authorizing the tribe to operate 250 slot machines. Three other tribes agreed to similar terms, and all four compacts were approved by the Secretary of the Interior.

Three tribes intervening in the lawsuit before Judge Rosenblatt did not conclude compacts after July 1992 and continued with the lawsuit. In October 1992, Judge Rosenblatt denied the State's motion to dismiss. The court ordered negotiations to resume, and when no result was produced, appointed a mediator pursuant to 25 U.S.C. § 2710(d)(7)(B)(iv). *Yavapai–Prescott*, 796 F.Supp. at 1298. Former Arizona Supreme Court Chief Justice Frank X. Gordon, Jr., was chosen as the mediator.

In the IGRA mediation process, both the tribe and the State submit proposed compacts representing their respective last best offers, and the mediator selects that which best comported with IGRA. 25 U.S.C. § 2710(d)(7)(B)(iv). As Judge Gordon observed, "under the Act, true mediation is not contemplated: the Mediator is forced to choose one of two competing compacts in its entirety." JSOF Ex. 17 (Mediator's Selection of Proposed Gaming Compacts, dated February 15, 1993) at 2. In the *Yavapai–Prescott* case, Justice Gordon selected the compacts presented by the three tribes. He found that Arizona allowed class III gaming of the kind sought by the tribes, particularly in its design of state lottery games, but also in charity casino nights and regulated parimutuel gaming. He added:

> In conclusion, I would state that my selection of compacts in this case is based on the state and federal law as it exists today. Things might be different if Arizona would hereafter legislatively abolish all Class III gaming ....

*Id.* at 8.

After Justice Gordon announced his decision, then-Governor Symington was advised by Senator John McCain that in order to avoid casino gaming on reservations within Arizona, the State would have to prohibit all casino gaming for all purposes. *See* JSOF Ex. 18 (letter dated February 17, 1993 from Sen. McCain to Gov. Symington). The Governor convened a special session of the Legislature and championed S.B. 1001, which would have criminalized any type of casino gaming activities conducted by any person, organization or entity for any purpose. The new law removed the exception for "regulated

---

**20.** The statement reads:

> The Congress of the United States having enacted [IGRA], compelling this state and various Indian tribes within this state, upon tribal request, to negotiate compacts to permit certain gaming operations on Indian lands within this state, it is the intention of this legislation to authorize the negotiation of such compacts, with due regard for the

public health, safety and welfare in furtherance of fairness and honesty in the operation of gaming and with due regard for the interests of the Indian tribes and other and lawful existing gaming operations beyond Indian lands.

1992 Ariz. Sess. Laws. ch. 286 § 1 (emphasis added).

gambling" from the State's criminal law prohibiting promotion of gambling. JSOF Ex. 20 (S.B. 1001, 1993 Ariz. Sess. Laws 1st Spec. Sess. ch.1). The Governor approved S.B. 1001 on March 5, 1993. JSOF ¶ 20.

The Governor thereafter refused to sign the compacts selected by the mediator. Pursuant to 25 U.S.C. § 2710(d)(7)(B)(vii), the Secretary of the Interior undertook negotiations with the tribes and the State to reach a compromise compact. On June 24, 1993, the Governor and the three tribes broke the stalemate and entered into compromise compacts. Five additional tribes also entered compacts that day. *See* JSOF Ex. 24 (News Release from the Executive Office of the Governor, June 24, 1993).[21] Between June 24, 1993 and April 25, 1994, the Governor entered compacts with sixteen tribes.

The greyhound racing interests promptly threatened legal action. On June 29, 1993, counsel for companies including some of the parties here (American Greyhound Racing, Inc., and Tucson Greyhound Park, Inc.) advised the Tohono O'Odham Nation of his intent to file suit to enjoin the compact as void. JSOF Ex. 27 (letter from Paul Bardacke). The record here does not reflect a lawsuit being filed at that time, however.

Not long after the compacts were entered, the Ninth Circuit catalyzed a change in the Governor's position. It held that states are not obliged by IGRA to enter compacts on terms that authorize gambling illegal under state law. *Rumsey Indian Rancheria of Wintun Indians v. Wilson*, 41 F.3d 421, 423 (9th Cir.1994), *as amended* 99 F.3d 321 (9th Cir.1996).

In *Rumsey*, the plaintiffs sought a compact allowing them to operate electronic gaming devices, such as video bingo machines, and banked and percentage card games.[22] 41 F.3d at 424. The tribes had previously operated nonelectronic or nonbanked, nonpercentage versions of the games, and that was legal in California. *Id.* n. 1. The State balked at the tribes' new proposal, however, on the grounds that state law prohibited the games they sought. The tribes brought a declaratory judgment action.

The tribes pointed out that California allowed video lottery and nonbanked, nonpercentage card games. They viewed these activities as "functionally similar" to the electronic devices and banked/percentage card games. They believed IGRA required the State to enter compacts providing for all games that did not violate California public policy, independent of their legality under state law. *Id.* at 426.

The Ninth Circuit disagreed. "IGRA does not require a state to negotiate over one form of a gaming activity simply because it has legalized another, albeit similar form of gaming." 41 F.3d at 427. "[A] state need only allow Indian tribes to operate games that others can operate, but need not give tribes what others cannot have." *Id.*

Following *Rumsey*, in May 1995, the Salt River Pima–Maricopa Indian Community ("Salt River Community") asked Arizona to enter a gaming compact along the lines of those concluded with the sixteen other tribes. Then–Governor Symington refused to enter a compact allowing slot machine or keno gaming because, he main-

---

**21.** The legislature subsequently repealed S.B. 1001. 1994 Ariz. Sess. Laws ch. 285, § 1.

**22.** In a nutshell, the card games California permitted did not allow the house to make money. In a "banked game," a gaming oper-

ator participates in the game and acts as a house bank, paying the winners and keeping all other players' losses. In a percentage game, the gaming operator takes a cut of all amounts wagered or won. *Rumsey*, 41 F.3d at 424 n. 2.

tained, those forms of gaming were not permitted under state law. The Salt River Community responded by sponsoring an initiative to enact A.R.S. § 5–601.01, which passed handily. JSOF ¶ 44.

When the Salt River Community tendered a standard form compact to the Governor, he demanded the inclusion of a clause that would give the State the right to approve any proposed casino location. *See Salt River Pima–Maricopa Indian Community v. Hull,* 190 Ariz. 97, 945 P.2d 818 (1997). The Salt River Community filed a special action in the Arizona Supreme Court, arguing that § 5–601.01 did not allow the Governor to demand additional terms.

The Salt River Community won. The Governor argued that § 5–601.01 preempted IGRA's provision requiring tribes and states to negotiate. The Court read § 5–601.01 to leave the Governor's power to negotiate under § 5–601 intact, but to provide the standard form compact as a default should negotiations fail. 945 P.2d at 822. No conflict with IGRA was found. *Id.* 945 P.2d at 823–24. The Governor also argued that § 5–601.01 violated the state doctrine of separation of powers by limiting his discretion under § 5–601. The Court agreed that § 5–601.01 restricted the broad negotiating authority given by § 5–601, but that the governor was entitled to no more discretion than the legislature (or voters) decided to give. *Id.* at 825. Finally, the Court rejected the Governor's suggestion that § 5–601.01 was an unconstitutional "local or special law." *Id.*

Vice Chief Justice Jones concurred, pointing out that allowing the Salt River Community a standard form compact did not answer "the more dispositive federal question, neither raised nor argued before us—whether, in Arizona, a tribe is autho-

rized under IGRA to engage in class III gaming. Clearly, the state has no power to grant such authority." 945 P.2d at 826. "[T]he question must ultimately be posed whether the State of Arizona, which prohibits class III gaming generally, has a federally imposed duty to negotiate, and, more importantly, whether any tribe in Arizona ... has the right to engage in such gaming." *Id.* at 827.

After the Salt River Community prevailed in the Arizona Supreme Court, a family named Sears brought a special action in the Superior Court in Maricopa County seeking a writ of mandamus to prevent the Governor from entering a standard form gaming compact with the tribe. On August 22, 1997, Judge B. Michael Dann granted the relief requested, finding that Arizona does not permit keno or slot machine gaming and that a compact could not include such games under IGRA. JSOF Ex. 38 (Minute Entry).[23] He discounted the evidence of charity casino nights—crucial to Justice Gordon's mediation decision—on the grounds that (1) there was no evidence that law enforcement authorities were aware of or condoned such events; and (2) such uses are "not normally thought of as 'gaming' or 'gambling activities.'" *Id.* at 2. He held that equal treatment was an object of IGRA and that the State could not permit tribes to conduct games prohibited to other Arizonans. *Id.* at 3. Judge Dann held that slot machines, by their "inherent nature" could not fit under the "social gambling" exception to Arizona criminal law. *Id.* at 4. He did not discuss the Attorney General's opinion that a charity could carefully design a casino night party to use slot machines pursuant to a statutory exception.

---

**23.** The court may not rely on this opinion for precedential purposes, but sets forth a de- scription of it for historical purposes and because it has been raised by the parties.

The Arizona Supreme Court vacated Judge Dann's decision and dismissed the matter because the plaintiffs lacked standing. *Sears v. Hull,* 192 Ariz. 65, 961 P.2d 1013 (1998). The Supreme Court refused to exercise its discretion to waive the requirement of standing. *Id.* at 1019. The Court explained that it could dispense with standing rules "in cases involving issues of great public importance that are likely to recur." *Id.* However, the Court determined that the Searses' case did not present sufficiently significant issues: "Essentially the Sears allege that the proposed gaming activities will result in the deterioration of their quality of life." *Id.* at 1020. "The remaining issues, which essentially reflect the Sears' opposition to gaming and their interpretation of the statutes involved, are not of such great moment or public importance as to convince us to consider this challenge to executive conduct." *Id.*

Governor Hull expressed interest in negotiating renewals of the compacts as early as November 1999. *See* Motion *in Limine* (doc. # 73) Ex. 1 (letter from Gov. Hull to Dep't of Gaming Director Stephen Hart dated 11/9/99). She asked the Department of Gaming to hold public hearings on the subject of casino gaming in Arizona. The Governor has not, however, expressed her position on casino gaming generally or tribal gaming in particular.

Having surveyed the landscape, the court turns to the Plaintiffs' and Intervenor's claims.

### B. *Analysis*

In moving for summary judgment, the Plaintiffs identify three issues, one with four subparts. Motion (doc. # 46) at 2. They elaborated on these issues at trial. Discussion of the first issue—whether a compact proposal contemplating slot machines, keno and blackjack, is contrary to IGRA—is foreclosed by the court's im-

plied-right-of-action analysis and will not be further discussed. *See* Part III.B, *supra.* The second issue designated is whether A.R.S. § 5–601 *et seq.* authorizes the Governor to enter into compacts permitting forms of gaming, which are prohibited by IGRA and by state law. Subsumed in this issue is an assumption that IGRA and state law prohibit certain games, a premise that the court must examine. The third issue is whether, assuming that A.R.S. § 5–601 *et seq.* authorizes the Governor to enter compacts for games alleged banned by state criminal law, those Arizona statutes are constitutional. The Plaintiffs argue that the statutes would be unconstitutional under: (1) Ariz. Const. art. III and the doctrine of unconstitutional delegation of legislative powers; (2) Ariz. Const. art. II, § 13, as a grant of privileges or immunities not equally available to other citizens or corporations; (3) Ariz. Const. art. IV, pt. 2, § 19, as a "local or special law"; and (4) the Equal Protection Clause of the United States Constitution.

The Intervenor raises the following unique claims: (1) compacts are treaties and states are prohibited by the United States Constitution, Art. I § 10, from entering treaties, Merits Brief (doc. # 43) at 5; and (2) A.R.S. § 5–601 is unconstitutional because compacts are legislation and the legislature cannot make the validity of a law contingent upon tribal assent, *id.* at 4.

### 1. Extent of gubernatorial negotiating power

A.R.S. § 5–601 authorizes the Governor to negotiate and enter compacts:

> *Notwithstanding any other law,* this state, through the governor, may enter into negotiations and execute tribal-state compacts with Indian tribes in this state *pursuant to* the Indian gaming regulatory act of 1988. Notwithstanding the

authority granted to the governor by this subsection, this state specifically reserves all of its rights, as attributes of its inherent sovereignty, recognized by the tenth and eleventh amendments to the United States Constitution. The governor shall not execute a tribal-state compact which waives, abrogates or diminishes these rights.

A.R.S. § 5–601(A) (emphasis added). In addition, the statute places certain conditions on future compacts and/or renewal.[24]

Three disputes have arisen as the parties interpret this statute. First, what kinds of gaming are allowed under Arizona law? Because the compacts are to be entered pursuant to IGRA, and IGRA contemplates tribal participation in gaming otherwise condoned by state law, the parties indicate that the limits of state gambling laws must be understood in order to assess the validity of slot machine, blackjack and keno terms. Second, does A.R.S. § 5–601 allow the Governor to enter compacts permitting tribes to engage in gambling otherwise prohibited by state law? Third, what are the State's obligations under IGRA? Specifically, when IGRA requires states to enter compacts for gaming allowed to "any person for any purpose," does it prohibit states from entering compacts that allow tribes to engage in gaming uniformly prohibited by state law?

### a. *Games legal under Arizona law*

Arizona generally prohibits gambling. Conducting, organizing or financing gambling is a felony, A.R.S. § 13–3303, and so is possessing gambling equipment for the purpose of gambling, subject to certain exceptions, *id.* § 13–3306. Knowingly obtaining a benefit from gambling is a misdemeanor. A.R.S. § 13–3304. Nevertheless, Arizona permits gambling under certain exceptions. The statute reads as follows:

A. The following conduct is not unlawful under this chapter:

1. Amusement gambling.[25]

2. Social gambling.[26]

---

**24.** Beginning on June 1, 2003, tribal-state gaming compacts must include clauses: prohibiting wagering by persons under 21 years of age; establishing guidelines on automated teller machine use and on the use of credit cards or other forms of credit in gaming facilities, requiring the tribes to post signs advertising a gambling crisis hotline; prohibiting advertising geared specifically toward minors; establishing guidelines for treatment and prevention of problem and pathological gambling; etc. A.R.S. §§ 5–601(B), (I).

**25.** A.R.S. § 13–3302(1) defines "amusement gambling" as "gambling involving a device, game or contest which is played for entertainment if all of the following apply:

(a) The player or players actively participate . . . .

(b) The outcome is not in the control to any material degree of any person other than the player or players.

(c) The prizes are not offered as a lure to separate the player or players from their money.

(d) Any of the following:

(i) No benefit is given to the player or players other than an immediate and unrecorded right to replay which is not exchangeable for value.

(ii) The gambling is an athletic event and no person other than the player or players derives a profit or chance of a profit from the money paid to gamble by the player or players.

(iii) The gambling is an intellectual contest or event, the money paid to gamble is part of an established purchase price for a product, no increment has been added to the price in connection with the gambling event and no drawing or lottery is held to determine the winner or winners.

(iv) Skill and not chance is clearly the predominant factor in the game and . . . regardless of the number of wins, no . . . merchandise prize with a wholesale fair market value of greater than thirty-five dollars.

**26.** A.R.S. § 13–3301(7) defines "social gambling" as "gambling that is not conducted as a business and that involves players who com-

3. Regulated gambling if the gambling is conducted in accordance with the statutes, rules or orders governing the gambling.

4. Gambling conducted at state, county or district fairs, which complies with the provisions of § 13–3301, paragraph 1, subdivision (d).

B. An organization which has qualified for an exemption from taxation of income under § 43–1201, paragraph 1, 2, 4, 5, 6, 7, 10 or 11 may conduct a raffle that is subject to [certain] restrictions:

. . . .

C. A state, county or local historical society designated by this state or a county, city or town to conduct a raffle may conduct the raffle subject to [certain] conditions. . . .

A.R.S. § 13–3302.

The Arizona Attorney General has suggested how a charity might lawfully operate a casino night under these limitations. *See* Ariz. Op. Att. Gen. No. I–87–101 (1987). On the Attorney General's hypothesis, a charity might divorce the fundraising part from the gaming part of a "casino night" by giving any attendee who requests them chips or scrip without accepting a donation in return. Such games would not fall within the definition of "gambling" in § 13–3301(4). Alternatively, the charity could bring gambling under the raffle exception by asking attendees to buy raffle tickets to use as chips in the games. At the end of the evening, prizes would be raffled off to ticket holders. In this case,

"the games merely serve to distribute and redistribute the chances of winning the raffle among the players." *Id.* Using the raffle exception set out at A.R.S. § 13–3302(B), a charity may engage in permissible "regulated gambling." *See* A.R.S. § 13–3302(A)(3).

Pursuant to one exception or the other, casino nights are apparently not uncommon in Arizona. According to one estimate, several hundred such events are held annually. JSOF Ex. 55 (Barton Aff.) ¶ 8. Gary W. Barton, intelligence manager for the Arizona Department of Gaming, submits that the custom in renting casino-night equipment is sufficient to support at least twelve businesses. *Id.* ¶ 9. One such casino night event is described by David Van Boxtaele, a special investigator for the Arizona Department of Gaming. JSOF Ex. 56 (Van Boxtaele Aff.). He attended an event sponsored by the School of Hotel and Restaurant Management at Northern Arizona University. *Id.* ¶ 2. Van Boxtaele describes giving a donation in exchange for receiving a corresponding amount of scrip, playing games such as live blackjack and computerized slots, and using his scrip winnings to purchase raffle tickets. *Id.* ¶¶ 3–4. Stephen M. Weiss, whose pertinent experience is having managed a charity casino night event for several years, describes other casino nights in similar terms. JSOF Ex. 39 (Weiss Aff.).

Notwithstanding the open practices of charities, the Plaintiffs maintain that slot machine, keno and blackjack gaming are

pete on equal terms with each other in a gamble if all of the following apply:

(a) No player receives, or becomes entitled to receive, any benefit, directly or indirectly, other than the player's winnings from the gamble.

(b) No other person receives or becomes entitled to receive any benefit, directly or indirectly, from the gambling activity, including benefits of proprietorship, manage-

ment or unequal advantage or odds in a series of gambles.

(c) Until June 1, 2003, none of the players is below the age of majority. Beginning on June 1, 2003, none of the players is under twenty-one years of age.

(d) Players "compete on equal terms with each other in a gamble" when no player enjoys an advantage over any other player in the gamble under the conditions or rules of the game or contest.

prohibited in Arizona. The Plaintiffs make two arguments. The first attempts to distinguish "charitable" gaming—embraced by the State—and "commercial" gaming—banned by the State. Second, the Plaintiffs argue that slot machine, keno and blackjack gaming cannot be squeezed into the raffle exception on which charities depend.

### i. Charitable v. commercial

The Plaintiffs suggest that charity casino gaming should be distinguished from "commercial" gaming. The Plaintiffs appear to use the term "commercial gaming" interchangeably with gaming "as a business," Motion (doc. #46) at 7, gaming "played against the house," *id.*, and "real gambling" *id.* at 9. The rationale for the Plaintiffs' proposed distinction is clear: if the Plaintiffs cannot convince the court that certain kinds of games are prohibited, then the only way to keep tribes from engaging in the games offered at charity casino nights is to distinguish the nature of the gaming. If the court were to hold that the "commercial" gaming is a different species from "charitable" gaming, and only "charitable" gaming is permitted in Arizona, then the Plaintiffs would have a basis for confining tribes to "charitable" gaming only.

Based on the affidavit of A. Melvin McDonald, the Plaintiffs seek a factual finding that no commercial slot machine gaming is allowed in Arizona, except what the tribes do. McDonald, Chairman of the Arizona Racing Commission, states that no slot machine or keno gaming for money stakes has been allowed in Arizona since 1970, and that no "commercial blackjack" gaming for money stakes has been allowed during that time either. JSOF Ex. 66 (McDonald Aff.) ¶ 7.

The Defendants respond that a charitable/commercial distinction is irrelevant, because once a game is permitted for *some* purpose, IGRA requires that the State enter compacts including that game, even if the purpose of the tribes is different from the purpose permitted by state law. They observe that since charitable gaming involves exchanging cash for the opportunity to win a valuable prize, it is "real" gambling; indeed, "real" enough to require a statutory exception. The Defendants also contend that the purpose of tribal gaming better approximates the purpose of charitable gaming than private commercial gaming.

In the court's view, the Plaintiffs' proposed charity/commercial gaming distinction is so porous that it cannot be maintained. For one thing, the Plaintiffs never offer a definition of "commercial gaming." "Commercial" means many things, but generally suggests mercantile activity. *Webster's Third International Dictionary* 456 (1981). The court must infer that the proposed distinction has something to do with where net revenue goes, not with the scale of the enterprise. But not all gaming can readily be classified in Plaintiffs' two proposed categories. One obvious illustration of the shortcoming of the Plaintiffs' distinction is the state lottery. Plaintiffs do not indicate whether funding governmental functions with gaming revenue in lieu of taxation should be considered "commercial" or "charitable" gaming. "Commercial" is a term too imprecise to bear legal weight without further definition.

Furthermore, it is far from obvious that if a charitable/commercial line were drawn, tribes would fall on the commercial side. By law, tribes use casino net revenues to fund tribal government operations, provide for the general welfare of the tribe and its members, promote tribal economic development, donate to charitable organizations, or help fund operations of local government agencies. 25 U.S.C. § 2710(b)(2)(B). Cash distributions are made per capita to

individual tribal members only if an "adequate" portion of net gaming revenues is allocated to the purposes described in section 2710(b)(2)(B) and the Bureau for Indian Affairs approves the revenue allocation plan. 25 C.F.R. Part 290.

Dr. Clinton M. Pattea, the President of the Tribal Council of the Fort McDowell Yavapai Nation, described how Fort McDowell has funded a number of governmental projects with gaming revenues. JSOF Ex. 67 (Pattea Aff.) ¶¶ 11–26. Infrastructure projects include building a wastewater treatment plant, improving the water system, closing a potentially hazardous landfill, building roads, buying out HUD housing, and building homes to alleviate a housing shortage. *Id.* The Nation has also begun providing a number of social services.

Merna Lewis, Vice President of the Salt River Pima–Maricopa Indian Community, describes how gaming revenue has enabled the Salt River government to expand social services. JSOF Ex. 68 (Lewis Aff.) ¶ 11. Infrastructure projects include a $100 million water system, a sewer system, flood control, roads, and a state-of-the-art wireless telephone system. *Id.* ¶¶ 16–20.

Under the circumstances, the proposed commercial/charitable gaming distinction is unsound and the court declines to make any findings to support it.

### ii. Raffle

The Plaintiffs begin by assuming that charities can use slot machines, keno and other games to distribute and redistribute raffle tickets pursuant to A.R.S. § 13–3302. They argue that the only kind of slot machine gaming Arizona allows is "raffle *cum* slot machine" gaming. Motion for Summary Judgment (doc. # 46) at 7. Alternatively, the Plaintiffs argue that slot machines may not be used by charities in any way.

In response, the Defendants argue that Arizona permits slot machine, keno and blackjack gaming to charities under the regulated gambling exception. They rely on circumstantial evidence. First, they point out that in his mediator opinion, Justice Gordon found that Arizona permits casino-style gaming to charities. Next, the Defendants rely on the Arizona Attorney General Opinions, Nos. I87–101 and I90–035. Third, they raise an inference from legislative behavior over the last several years. Finally, the Defendants contend that Arizona law allows casino-style gaming on Indian reservations. For the reasons that follow, the court finds these points, which tend to suggest that casino gaming was legalized by fiat, to be unpersuasive.

The court begins with the language of the criminal statutes.[27] Penal statutes are not strictly construed but rather are construed according to the fair import of their terms, with a view to effect their object and to promote justice. A.R.S. §§ 1–211(C); 13–104. The court's goal is "to fulfill the intent of the legisla-

27. The prohibition on the promotion of gambling reads:

 A. Except for amusement, regulated or social gambling, a person commits promotion of gambling if he knowingly does either of the following for a benefit:
 1. Conducts, organizes, manages, directs, supervises or finances gambling.
 2. Furnishes advice or assistance for the conduct, organization, management, direction, supervision or financing of gambling.
A.R.S. § 13–3303. The prohibition on benefiting from gambling provides:
 A. Except for amusement or regulated gambling, a person commits benefiting from gambling if he knowingly obtains any benefit from gambling.
 B. Benefiting from social gambling as a player is not unlawful under this section.
A.R.S. § 13–3304.

ture that wrote it." *Zamora v. Reinstein,* 185 Ariz. 272, 915 P.2d 1227, 1230 (1996) (quoting *State v. Williams,* 175 Ariz. 98, 854 P.2d 131, 133 (1993)); *accord State v. Clifton Lodge No. 1174,* 20 Ariz.App. 512, 514 P.2d 265, 266 (1973) (construing forfeiture statute to serve legislative purpose of discouraging gambling). When the statute's language is plain and unambiguous, it is not necessary to go beyond the text as written. *Canon School Dist. No. 50 v. W.E.S. Constr. Co.,* 177 Ariz. 526, 869 P.2d 500, 503 (1994). When the statute's language is not clear, legislative intent is determined by reading the statute as a whole, giving meaningful operation to all of its provisions, and considering factors such as the statute's context, subject matter, historical background, effects and consequences, and spirit and purpose. *Wyatt v. Wehmueller,* 167 Ariz. 281, 806 P.2d 870, 873 (1991).

The criminal statutes are crafted as broad prohibitions against promoting and benefitting from gambling, subject to express exceptions. A.R.S. §§ 13–3303, 13–3304. When gaming is not structured as social or amusement gambling, the only game of chance that is permitted under Arizona law is the raffle, subject to regulation. A.R.S. § 13–3302(B). While "raffle" is not defined, there is nothing in the text of the Arizona statutes to suggest that "raffle" means slot machine, blackjack and keno gaming. Interpreting "raffle" to legalize these games indirectly would allow the exception for "regulated gambling" to defeat the broad prohibition. Such a result would vitiate Arizona's anti-gambling policy and must be rejected. The court holds that other games may not be bootstrapped into legitimacy by the raffle exception.

The existence of the Attorney General Opinions Nos. I87–101 and I90–035 in no way stretches or expands the limited exception for charity raffles. These opinions have no legal force and cannot be considered regulations prescribing how raffles should be run or how casino nights should be operated. *See State v. Deddens,* 112 Ariz. 425, 542 P.2d 1124, 1127 (1975) (Attorney General opinions are merely advisory). That prior Attorneys General have countenanced distribution and redistribution of raffle tickets through games of chance does not make casino gambling lawful, for the opinions simply elaborate on the possibilities within the raffle rule.

The evidence before the court tends to establish that the raffle rule is being respected by charities. In his opinion as mediator, Justice Gordon found that charity casino nights were not subject to regulation, suggesting that the raffle rule was widely ignored. *See* JSOF Ex. 17 (Mediator's opinion) at 6. There is nothing in the record here to support a factual finding that Arizona ignores the raffle requirement and allows non-raffle gambling by charities to flourish unchecked.[28] The testimony of the gaming inspectors is that charity gambling is conducted pursuant to the raffle exception. Neither party has argued that the mediator's findings should be accorded collateral estoppel effect.

Turning to the Defendants' third argument, the court is aware that last year, the prohibition on possession of gambling devices was amended by S.B. 1090. Ariz. Rev.Stat. § 13–3306(E) now carves out an express exception for "the use of gambling devices by nonprofit or charitable organizations pursuant to § 13–3302, subsection

---

**28.** Plaintiffs argue that slot machines and keno lack the capacity to distribute raffle tickets neutrally among players because these devices invariably generate a cut for the house and that these games cannot be used pursuant to the raffle exception. There is no evidence in the record to support any such findings.

B." However, the term "gambling device" refers to "any implement, machine, paraphernalia, equipment or other thing" "used or intended to be used" in violation of the gambling prohibitions. A.R.S. § 13–3306(A). The exception legalizes gambling devices for use with raffles, but sheds no new light on what a raffle is. Therefore, it does not support an inference that the legislature intended to legalize gaming by charities other than raffles.

Defendants suggest that "[b]y enacting A.R.S. § 5–601, the Legislature recognized it was authorizing gaming compacts that allowed tribal casino gaming, including slot machines." *See* Response (doc. # 60) at 13. They point to the historical context in which § 5–601 was enacted. Defendants' position is that tribal casino gaming is "regulated" under § 5–601, which makes it lawful "regulated gambling" under A.R.S. § 13–3301(6).[29]

There are multiple problems with this logic. To find that tribal gaming generally is lawful does not answer the substantive question about what kind of class III gaming is lawful in Arizona. Section 5–601 has no substantive component, but instead authorizes the Governor to negotiate compacts "notwithstanding any other law." What "any other law" requires is a separate issue. Thus, § 5–601 *et seq.* and consequent tribal gaming does not validate slot machine or any other particular kind of gaming.

Defendants argue that because A.R.S. § 5–601 was passed as an emergency mea-

sure at the Governor's request after he had proposed compacts allowing slot machines, the legislature intended to endorse slot machine gaming. While the context in which a law is enacted may be illuminating, the court hesitates to draw inferences about the Arizona Legislature's understanding of the substantive gambling law based on events surrounding enactment of an enabling law without substantive content.

In any event, the evidence does not support Defendants' position. It shall be recalled that the Governor first proposed slot machines in late May, right around the time Judge Rosenblatt issued his opinion, *Yavapai–Prescott Indian Tribe v. State,* 796 F.Supp. 1292 (D.Ariz.1992).[30] The issue before the court was "whether the State must include casino and video gaming in a tribal-state compact." *Id.* at 1294 n. 7. The nature of the dispute confirms that the State believed such gambling was not legal under state law. Judge Rosenblatt stated that class III gaming appeared "inevitable" but required the parties to negotiate further and did not rule on what kinds of class III gaming had to be offered to tribes.

Governor Symington then concluded compacts with certain tribes allowing some slot machine gaming, pursuant to A.R.S. § 5–601, which begins "Notwithstanding any other law...." On December 18, 1992, several months after A.R.S. § 5–601 had passed, the State continued to take the position that slot machine gambling is not

**29.** A.R.S. § 5–601(A) is set out at page 76, *supra.*

**30.** The only evidence of the Governor's proposal in the record is a newspaper article. *See* JSOF Ex. 6 (Ben Winton, "Symington offers gambling pact," Phoenix Gazette A–1 (May 29, 1992)). The newspaper writer indicates that Governor Symington released a draft proposal to tribes prior to Judge Rosenblatt's ruling, but it is not clear whether earli-

er draft proposals included slot machines. *Id.* The proposal released May 28, 1992, the day of Judge Rosenblatt's ruling, would have allowed slot machines on the condition that their numbers be limited, that no wagers of more than five dollars would be allowed, and that payoffs not exceed $250. *Id.* at A–12. The extensive conditions may be understood as a protest about the legality of any slot machines, far from the concession that the Defendants perceive.

legal in Arizona. *See* JSOF Ex. 11 (State Defendants' Brief to Mediator in Support of Last Best Offer) at 4, 5 (proposing 250 slot machines as a concession). The court finds Defendants' position that the Arizona Legislature intended to legalize slot machine gambling with the passage of A.R.S. § 5–601 to require a substantial leap of faith and rejects it as implausible.

Fourth, the Defendants argue that because Arizona has entered compacts that allowed tribes to engage in slot machine gaming, slot machines are permitted under state law. This argument proves nothing about the lawfulness of the initial permit that might justify its extension. Unlike *Forest County Potawatomi Comm. of Wisconsin v. Norquist,* 45 F.3d 1079 (7th Cir. 1995), where the legality of class III gaming had been previously determined in a separate case, here, no binding authority has determined that slot machine and related casino gaming is legal in Arizona. To the extent that *Norquist* can be read to justify class III gaming in one compact simply because similar compacts exist, this suggestion rests on circular reasoning and is otherwise dicta.[31]

■ Thus, the court concludes that only charity raffles are permitted under Arizona law. This does not, however, mean that the legislature did not attempt to authorize compacts with terms that would otherwise be in excess of state law. The court now construes the enabling statute, A.R.S. § 5–601.

### b. *"Notwithstanding any other law"*

According to the Plaintiffs, A.R.S. § 5–601(A) authorizes the Governor to negotiate only for such gaming that IGRA requires the State to provide. Motion (doc. #46) at 15. They argue that IGRA requires states to enter compacts allowing gaming otherwise tolerated under state law, but does not obligate states to agree to terms beyond the limits of state law. The Defendants, on the other hand, argue that A.R.S. § 5–601 expressly authorizes the Governor to enter compacts that allow class III gaming otherwise prohibited in Arizona. Response at 12. In reply, the Plaintiffs attach to a different bit of the statute, the phrase "pursuant to" IGRA. They argue that this phrase confines the Governor's power to enter compacts to the State's obligations to comply with IGRA.

The court believes that the Defendants have the better view of A.R.S. § 5–601. "Notwithstanding any other law" is a phrase of unlimited exception. There is reason to believe that the legislature understood the phrase in this way. The drafting manual used by state legislators advises that to create an exception, a bill should begin with a clause identifying the otherwise applicable statute, reading "notwithstanding section 35–174, [the exception goes as follows ...]." *See* Ariz. Legislative Council, Arizona Bill Drafting Manual 48 (1985). Use of this construction in § 5–601 suggests that the legislature meant to create an expansive exception.

---

**31.** In *Norquist,* the tribe sought declaratory relief to enjoin city officials from interfering with class III gaming activities in Milwaukee. 45 F.3d at 1082. An agreement between the parties provided that as a condition for class III gaming in the city, class III gaming had to be allowed in Wisconsin for any purpose by any person. *Id.* at 1083. In finding this condition had been met, the Seventh Circuit relied on a previous adjudication that had found class III gaming permitted in Wisconsin. In an accompanying footnote, the *Norquist* court added that class III gaming was legal in Wisconsin because Wisconsin "presently permits other Indian tribes within the state to carry on the exact gaming activities being alleged here." *Id.* at 1083 n. 1. In fact, the other compacts were created in reliance on the holding of the earlier case, *id.* at 1081, and could not be taken for independent evidence of the legality of class III gaming.

Section 5–601 begins by identifying itself as an exception to all other law, then endorses negotiations and entry into compacts. No substantive limits about kinds of gaming are imposed on the governor's compacting authority. There is no provision for legislative ratification or public referendum. The legislature demanded only that the State's sovereign immunity and similar prerogatives be respected. The exception from other existing state law and the detachment from lawmaking bodies is complete.

■■■ The Plaintiffs would have the court read in a requirement that the Governor not negotiate for any games banned by state law. The Plaintiffs' attempt to reimport state substantive prohibitions through IGRA renders the statute convoluted and creates an unnecessary tension. If state law were reintroduced "pursuant to" IGRA, the meaning of the "notwithstanding" phrase conflicts with the reintroduced laws. The court finds the Plaintiffs' construction unpersuasive. Therefore, the court holds that A.R.S. § 5–601 authorizes the Governor to negotiate and enter compacts for kinds of tribal gaming that Arizona otherwise prohibits.

### c. State obligations under IGRA

The court reads the Defendants' brief to assert that IGRA should be understood to require, at a minimum, a compact permitting tribes to engage in any class III gaming the State permits "for any person for any purpose." Response (doc. # 60) at 9.[32] The minimum idea is crucial. The Plaintiffs, on the other hand, maintain that IGRA prohibits gaming under tribal-state compacts if such gaming is not permitted under state law. Motion (doc. # 46) at 3, 13–14. The Plaintiffs argue that Congress did not intend to create "jurisdictional islands" where community norms—as expressed in state law—are not enforced.

■■■ The court conceives this question as whether IGRA establishes a ceiling for compact terms, or a floor. That is, whether IGRA permits states to offer only such games that are legal for any person for any purpose (a ceiling), or whether IGRA requires states to offer tribes terms equal to those granted their own citizens, plus allows states to agree to any additional gaming (a floor). For the reasons that follow, the court believes a ceiling view is mandated.

■■■ IGRA imposes three prerequisites to lawful class III gaming: (A) an authorizing tribal ordinance, (B) location "in a State that permits such gaming for any purpose by any person, organization, or entity," and (C) a Tribal–State compact that "is in effect." 25 U.S.C. § 2710(d)(1). Section 2710(d)(1) allows class III gaming "only if" these three conditions are satisfied. A lawfully made state compact satisfies subsection (C), but it cannot satisfy the independent requirement of subsection (B), which demands that gaming be permitted under state law. According to the structure of § 2710(d)(1) and its plain terms, a compact cannot make legal class III gaming not otherwise permitted by state law. The State must first legalize a game, even if only for tribes, before it can become a compact term.

Federal courts have adopted what the court shall call a "ceiling" perspective, holding that 25 U.S.C. § 2710(d)(1) requires compact games to be lawful under state law. *See Citizen Band Potawatomi Indian Tribe v. Green,* 995 F.2d 179, 181 (10th Cir.1993); *United States v. Santee*

---

**32.** Specifically, the Defendants write: "The provision obligating states to negotiate with tribes regarding types of gaming allowed to others for any purpose was not designed to restrict the states' ability to allow certain class III gaming within Indian reservations." *Id.* (emphasis omitted).

*Sioux Tribe of Nebraska,* 135 F.3d 558, 564 (8th Cir.1998). The Tenth Circuit rejected as "patent bootstrapping" a suggestion that a compact could legalize devices prohibited by state law. *Green,* 995 F.2d at 181; *see also U.S. v. Santa Ynez Band of Chumash Mission Indians of the Santa Ynez Reservation,* 33 F.Supp.2d 862 (C.D.Cal.1998) (describing games illegal under state law as "uncompactable").

■ The Ninth Circuit has held only that a state does not have to negotiate for any more class III games than are allowed under state law. *Rumsey Indian Rancheria of Wintun Indians v. Wilson,* 64 F.3d 1250 (9th Cir.1994). Thus, if a state permits one kind of class III gaming, such as pari-mutuel wagering, *Rumsey* holds that the state has no obligation to negotiate over other games, such as slot machines. *Accord, Cheyenne River Sioux Tribe v. South Dakota,* 3 F.3d 273, 279 (8th Cir. 1993), abrogated on other grounds by *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 72, 116 S.Ct. 1114, 1131, 134 L.Ed.2d 252 (1996). *Rumsey* dealt with the obligations of a reluctant state; it does not establish whether a state with enthusiasm for tribal gaming may afford tribes greater gaming privileges than state law otherwise provides. In the absence of Ninth Circuit precedent, the court follows the authority of the Tenth and Eighth Circuits, which profess the ceiling view. Accordingly, Arizona may enter compacts only for games that are legal under state law.

The Defendants' attempt to distinguish the Tenth Circuit's opinion in *Green,* 995 F.2d at 181, is unpersuasive. *Green* involved the Potawatomi tribe's plan to import video lottery terminals (VLTs) for use on tribal land. A tribal/state compact in force allowed VLTs only if the U.S. Attorney or a federal court first declared that importation of VLTs was legal under the Johnson Act. The U.S. Attorney and then the district court both declared that importing the VLTs would violate the Johnson Act's prohibition on possession or use of gambling devices. The tribe appealed.

The Tenth Circuit affirmed. While IGRA creates an exception to Johnson Act liability, it did not apply. Under IGRA, otherwise banned gambling devices may be used pursuant to a compact made "by a State in which gambling devices are legal." 25 U.S.C. § 2710(d)(6)(A). Oklahoma prohibited possessing or dealing in gambling devices, however, making it impossible for the tribe to bring the VLTs under the IGRA-created exception to the Johnson Act. *Green,* 995 F.2d at 181. Although video games in general were legal under state law, video games that operated as gambling devices were not. *Id.* The compact, which would have permitted the VLTs if they did not violate the Johnson Act, did not establish the legality of the gambling devices for purposes of the IGRA exception to the Johnson Act. *Id.*

The Defendants argue that the first question under *Green* should be whether Arizona prohibits possession of gambling devices. They have produced ample evidence to demonstrate that gambling devices are freely bought, sold and imported in Arizona. *Green* cannot be applicable, they argue. The court disagrees for two reasons.

First, to be legal in Arizona, slot machines must be operated in a fashion that does not constitute "gambling." State law does not tolerate using the machines to gamble. For the purpose of determining what IGRA permits, whether a device is "illegal" in the compacting state because it meets the definition of "gambling device" and its possession is prohibited, or because it is used for prohibited "gambling," amounts to a distinction without real consequence. The Johnson Act prohibits both possession and use of "any gambling device." 15 U.S.C. § 1175. As long as the

proposed gaming activity would violate the State's prohibitions on gambling devices, the exception under IGRA is not available.

Second, *Green* is not used here for its explanation of how state law interfaces with the IGRA exception to the Johnson Act. Rather, the pertinent insight is that IGRA makes a class III game's legality under state law a separate requirement from its inclusion in a tribal-state compact. 995 F.2d at 181. The Defendants' emphasis on the "possession" prohibition in Oklahoma law is misplaced.

The Defendants' "floor" interpretation of § 2710(d)(1) relies on legislative history and the application of IGRA by the Secretary of the Interior.[33] In the past, the Secretary of the Interior has taken the position that states should give tribes exclusive rights to operate certain gaming if tribes are to make payments to states, other than payments to cover direct expenses that the states incur in regulating compact gaming. *See* JSOF Ex. 64 (letter from Ass't Secretary of Indian Affairs to Chairman Robert Guenthardt, dated February 9, 1999). The Secretary maintained that the privilege of exclusive gaming rights would be a legitimate "operating cost" for which tribes could pay. If, however, a state extracted extra fees without the benefit of exclusivity, the state would violate 25 U.S.C. § 2710(d)(4), which forbids states from imposing any taxes or fees on tribal class III gaming. *Id.; accord* JSOF Ex. 62 (letter from Ass't Secretary of Indian Affairs to Chief Ralph Sturges, dated December 5, 1994).

■■■ In these letters, the Secretary's concern is not section 2710(d)(1), but rather the possibility of a state extracting revenues dedicated by Congress to tribes. The Secretary did not refer to section 2710(d)(1) when setting out this position.

The position taken in these letters cannot be considered an agency interpretation of § 2710(d)(1). It is perfectly conceivable that states could satisfy the Secretary's exclusivity demand and § 2710(d)(1)(B) together by enacting a state law authorizing only tribes to engage in a particular kind of gaming, or by legalizing that kind of gaming but granting only tribes permits. The state may not both legalize and grant exclusivity through a compact, however, for legality is a separate requirement under subsection 2710(d)(1)(C).

2. Constitutionality of A.R.S. § 5–601 *et seq.*

a. *Unconstitutional delegation of legislative powers*

■■■ The Plaintiffs argue that A.R.S. § 5–601 unconstitutionally delegates legislative authority by allowing the Governor unfettered discretion to annul state criminal gaming laws. In response, the Defendants argue that the delegation stops short of an executive "usurpation" of legislative power. Response at 19.

The Intervenor makes an argument similar to the Plaintiffs', contending that decisions about whether and to what extent gaming should be allowed are legislative. Opening Brief (doc. # 43) at 3–4. It argues that with A.R.S. § 5–601, the Legislature failed to define a tribal gaming policy or establish standards to guide the Governor. In response, the Defendants argue that the delegation of negotiating authority to the Governor is appropriately channeled. Response (doc. # 61) at 6. They also suggest that gaming compacts are *sui generis,* because Arizona "would normally not have any political say whatsoever" over gaming on tribal land. *Id.* at 7.

■■■ The separation of powers doctrine enshrined in the Arizona Constitution

---

**33.** To the extent that the Defendants also rely on *Yavapai–Prescott Indian Tribe,* 796 F.Supp.

1292, 1297 (D.Ariz.1992), the quoted portion is dicta.

protects one branch against the overreaching of any other branch. *State v. Prentiss*, 163 Ariz. 81, 786 P.2d 932, 935–36 (1989). "Nowhere in the United States is this system of structured liberty [of separation of powers] more explicitly and firmly expressed than in Arizona." *State ex rel. Woods v. Block*, 189 Ariz. 269, 942 P.2d 428, 434 (1997) (quoting *Mecham v. Gordon*, 156 Ariz. 297, 751 P.2d 957, 960 (1988)).[34] Under Arizona's tripartite system, the legislature formulates the law and the executive carries out the policies and purposes declared by the legislature. *Id.*

In order to delegate legislative power to an executive agent, the enabling statute need go no further than "giving the power to adopt rules and regulations to provide for the execution and enforcement of legislation." *Hernandez v. Frohmiller*, 68 Ariz. 242, 204 P.2d 854, 863 (1949). The legislature may not, however, convey its essential responsibility for making political choices. *See 3613 Ltd. v. Dep't of Liquor Licenses and Control*, 194 Ariz. 178, 978 P.2d 1282, 1287 (App.1999) (citing *Lake Havasu City v. Mohave County*, 138 Ariz. 552, 675 P.2d 1371, 1378 (App.1983)). Delegated powers "must, by the provisions of the act, be surrounded by standards, limitations, and policies." *Hernandez*, 204 P.2d at 863. Standards need not necessarily be set forth in express terms if they can reasonably be inferred from the statutory scheme as a whole. *State v. Ariz. Mines*

*Supply Co.*, 107 Ariz. 199, 484 P.2d 619, 625 (1971). Arizona courts require only an "intelligible principle" behind a delegation for it to be lawful. *Ethridge v. Ariz. State Bd. of Nursing*, 165 Ariz. 97, 796 P.2d 899, 906 (Ct.App.1989) (quoting *Industrial Union Dept. v. American Petroleum Inst.*, 448 U.S. 607, 685–86, 100 S.Ct. 2844, 2886, 65 L.Ed.2d 1010 (1980) (Rehnquist, J., concurring)). While admitting once that the boundary between lawful delegation and unconstitutional surrender of legislative power is fuzzy, the Arizona Supreme Court pronounced:

> It may safely be said that a statute which gives unlimited regulatory power to a commission, board or agency with no prescribed restraints nor criterion nor guide to its action offends the Constitution as a delegation of legislative power. The board must be corralled in some reasonable degree and *must not be permitted to range at large and determine for itself the conditions under which a law should exist and pass the law it thinks appropriate.*

*State v. Marana Plantations*, 75 Ariz. 111, 252 P.2d 87, 89 (1953) (emphasis added).

With § 5–601, there are few express conditions imposed by the legislature. The Arizona Supreme Court recognized that § 5–601 confers "almost unlimited power" on the Governor. *Salt River Pima–Maricopa Indian Community v. Hull*, 190 Ariz. 97, 945 P.2d 818, 824 (1997).[35] Those directions that do exist fail

---

**34.** In *Block*, the Arizona Supreme Court adopted a four-factor analysis to evaluate separation of powers issues; that is, whether one branch has purported to usurp the powers of another. 942 P.2d at 276 (adopting the test of *J.W. Hancock Enterprises v. Arizona State Registrar of Contractors*, 142 Ariz. 400, 690 P.2d 119, 124–25 (App.1984)). Here, however, the court confronts allegations not of legislative usurpation but of excessive legislative delegation. The parties do not suggest that *Block* should extend to non-delegation cases. Nothing in *Block* or subsequent separation-of-powers cases alters the older non-delegation case law. Indeed, the court perceives the *Block* Court's statements about the robustness of Arizona's separation of powers doctrine to tend to strengthen the non-delegation principle.

**35.** It shall be recalled that the question before the Arizona Supreme Court was whether A.R.S. § 5–601.01, which requires the Governor to enter standard form compacts in the event that negotiations fail, unconstitutionally modifies that broad grant of negotiating pow-

to articulate a policy toward gaming or impose standards for the Governor to determine which kinds of gaming are acceptable or under what conditions. Rather, by expressly waiving every other law, the legislature permitted the Governor to negotiate for any game. There are no wager limits, payoff caps, or other significant legislated precautions. No standards can be inferred from the statute as a whole, either. The statute consistently abdicates responsibility for figuring out how the State's obligations under IGRA may be fulfilled, even waiving "any other law" to accommodate a broader range of possible options, yet expressing an opinion on none.

The statute's direction to comply with IGRA imports no substantive constraints, for IGRA is designed to allow states to express their substantive concerns about class III gaming, not to impose federal rules. Especially if IGRA is read to endorse a "floor" view, as the Defendants submit, IGRA does not channel the Governor's discretion. Just as the health board must have a mandate more explicit than to "regulate sanitation and sanitary practices in the interests of public health" and to prevent "disability and mortality," *Marana*, 252 P.2d at 90, the Governor must be given to understand the legislative policy about gaming on tribal lands within the State in order to negotiate compacts.

In the court's view, the qualifications that the legislature has imposed to date—raising the legal gambling age, establishing guidelines for the placement of ATMs, implementing programs to control compulsive gambling, etc.—are little more than parsley garnishing the policy roast. These "sparse and peripheral" instructions do not provide an "intelligible principle" for the bulk of gaming issues. Section 5–601 enables the Governor to decide basic gaming policy and standards for the State solely in the course of negotiation with the tribes.

It is important to recognize that the legislature did not defer to the Governor's particular expertise in gaming issues when it created § 5–601. In *Arizona Mines Supply Co.*, 484 P.2d at 625, the Arizona Supreme Court recognized that environmental and economic regulation often depends on evidence best understood by experts. Another rationale for a loose statutory description of an agency's duties is that the legislature cannot anticipate the variety of possible need. *See State v. Wacker*, 86 Ariz. 247, 344 P.2d 1004, 1007 (1959) (agency charged with preventing introduction of pests to Arizona and suppressing propagation of present pests from one locality to another could not be give explicit directions in advance).

The expertise rationale for broad delegation is absent here, for the legislature has the capacity to strike the policy balances gambling regulation entails. For example, pari-mutuel gaming is highly regulated by statute, *see* A.R.S. § 5–101 *et seq.*, and against a broad prohibition of gambling, there is a limited statutory exception for raffles, A.R.S. §§ 13–3301(6); 13–3302. It is therefore incongruous that the legislature should abdicate responsibility for determining the kinds of compact games the State should negotiate. Any delicacy in the details about gambling is political, not technical or scientific. Nor have the Defendants offered any reason to believe that determining gambling regulatory policy requires flexibility in order to accommodate variable factual situations.

Some states grant their governors broad negotiating authority, reined in by a legislative ratification process. Accountability to the legislature might save compacts negotiated pursuant to § 5–601. *See Tillotson v. Frohmiller*, 34 Ariz. 394, 271 P. 867, 870 (1928) (holding delegation invalid because agent could choose to act on "inde-

er in section 5–601. *Salt River* does not es- tablish the legality of section 5–601.

pendent uncontrolled judgment"). Defendants attempt to distinguish *Tillotson*, but if the Governor is accountable to anyone under the current scheme, the Defendants have failed to identify to whom.

Other cases where compacts were invalidated on separation of powers grounds are instructive, although no compacts are subject to invalidation here. *See State ex rel. Clark v. Johnson*, 120 N.M. 562, 904 P.2d 11 (1995); *State ex rel. Stephan v. Finney*, 251 Kan. 559, 836 P.2d 1169, 1185 (1992). In *Clark*, the New Mexico Supreme Court held that a compact broadly permitting all sorts of games usurped the power of the legislative branch, because the compact gave the tribe "a virtually irrevocable and seemingly perpetual right" to conduct class III gaming. 904 P.2d at 23. The court believed that establishing a state's position on class III gaming involves striking a balance and is thus a legislative task. *Id.*

In *Finney*, the Governor of Kansas purported to rely on a statute generally allowing her to transact the business of the State in order to negotiate and bind the State of Kansas to a compact. The Kansas Supreme Court rejected her position because compacts are not regular state business:

> [T]he transaction of business connotes the day-to-day operation of government under previously established law or public policy. The implementation of law and policy rather than the enactment of law and the determination of public policy constitutes the transaction of business between Kansas and the federal government. The *carte blanche* interpretation asserted by the Governor herein is massive in its implication and, additionally, would have serious problems if challenged on grounds that it constitutes an impermissible delegation of the legislature's law-making powers.

*Id.* at 1178. The court went on to hold that the compact terms executed by the Governor created a state agency and delegated rule making authority to it, which were both legislative acts beyond the Governor's power. *Id.* at 1184. While the holding of *Finney* concerns a different issue, its passing observation about the unlawfulness of a *carte blanche* authorization is no less true for being ancillary. The court finds unpersuasive the Defendants' attempts to distinguish *Finney* by limiting that case to voiding the Kansas Governor's creation of a gaming agency. That the Arizona Legislature properly created a gaming agency does not mean that an Arizona governor does not engage in another kind of legislative act by establishing state gaming policy in the absence of legislative guidance.

The court agrees with the Intervenor and Plaintiffs in concluding that A.R.S. § 5–601 violates art. III of the Arizona Constitution and so is void. It is therefore unnecessary, strictly speaking, for the court to reach the Plaintiffs' other arguments to invalidate § 5–601, such as whether the statute is unconstitutional as a local or special law, and whether it or compacts created pursuant to it violate equal protection principles. Discussion of the Intervenor's theories about compacts being legislation contingent on tribal approval, or treaties in violation of the federal constitution, would similarly be redundant holdings. Given the time pressures bearing on the ultimate resolution of this litigation, however, the court finds it appropriate to consider alternate grounds in order to leave no issue unresolved.

### b. *"Local or special law"*

█ The Plaintiffs contend that compacts authorizing tribes to conduct slot machine, keno and blackjack gaming run afoul of the Arizona constitutional prohibition against "local or special laws." Motion at 18. In response, the Defendants

argue that the local or special law prohibition does not apply to tribal-state compacts because tribes are separate sovereigns and not corporations, associations or individuals, but if it does, its requirements are satisfied. Response (doc. # 60) at 28. In reply, the Plaintiffs maintain that tribes' sovereign status is irrelevant, because as long as a sovereign is engaged in commerce, the same analytical framework applies. Reply at 17.

 The Arizona Constitution prohibits local or special laws, including legislative grants to any corporation, association or individual of special or exclusive privileges, immunities or franchises. Ariz. Const. art. IV, part 2 § 19(13). Local laws reflect legislative favoritism for a particular area of the state. *State v. Loughran*, 143 Ariz. 345, 693 P.2d 1000, 1003 (App.1985). A law is special if it "applies only to certain members of a class or to an arbitrarily defined class which is not rationally related to a legitimate legislative purpose." *State Compensation Fund v. Symington*, 174 Ariz. 188, 848 P.2d 273, 277 (1993) (citations omitted). Conversely, a law of limited application is general so long as it applies to all cases and to all members of the specified class. *Arizona Downs v. Arizona Horsemen's Foundation*, 130 Ariz. 550, 637 P.2d 1053, 1061 (1981).

 The Arizona Supreme Court has explained that the prohibition against local and special laws is designed, among other things, "to secure uniformity of law throughout the state as far as possible." *State Compensation Fund*, 848 P.2d at 277. The State must treat similarly situated persons consistently, *Prescott Courier Inc. v. Moore*, 35 Ariz. 26, 274 P. 163, 165 (1929), or without arbitrarily favoring some, *see. Arizona Downs*, 637 P.2d at 1060.

 Here, the tribes are not within the State's jurisdiction. "[A]lthough a tribe may be within the geographical boundaries of a state, the tribe is jurisdictionally distinct from the state, and the state has no authority to impose its laws on the reservation." *Tracy v. Superior Court*, 168 Ariz. 23, 810 P.2d 1030, 1043 (1991). The court finds that the local or special law principle cannot be wielded against laws describing relationships with entities outside the State's jurisdiction.

 Even if local/special law analysis were appropriate, the Plaintiffs would not prevail. A three-part test is used to determine whether a law constitutes special or local legislation. *See Republic Inv. Fund v. Surprise*, 166 Ariz. 143, 800 P.2d 1251, 1257 (1990). A law does not violate Ariz. Const. art. IV part 2, § 19 if: (1) there is a rational basis for the classification; (2) the classification is legitimate, encompassing all members of the relevant class; and (3) the class is flexible, allowing members to move into and out of the class. *Id.*

i. Rational basis

 For local/special law purposes, a statutory classification should be upheld as reasonable unless it ·is "palpably arbitrary." *Chevron Chemical Co. v. Superior Court*, 131 Ariz. 431, 641 ·P.2d 1275, 1285 (1982). The Plaintiffs do not persuade the court that the State's decision to confine class III gaming to tribal lands is irrational. In their motion, the Plaintiffs write: "Gaming monopolies for Indian tribes would fail the rational basis test in light of the Congressional extinguishment of tribal sovereignty over Class III gaming prohibited by state law." Motion (doc. # 46) at 20. The court does not understand what is meant by this conclusory assertion, and the reply fails to clarify. In light of the federal government's unique relationship with Indian tribes, *see Morton v. Mancari*, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290

(1974), and the purpose of IGRA to "promote tribal economic development, tribal self-sufficiency, and strong tribal government," 25 U.S.C. § 2701(4), the court concludes that the distinction in state law following IGRA is rational.

### ii. Legitimate class

The Plaintiffs argue that classifying tribes as the only entities permitted to operate class III gaming excludes members of the relevant class. They define the relevant class as "all persons interested in conducting class III gaming." This is inaccurate. The relevant class is defined by federal law as Indian tribes, *see* 25 U.S.C. § 2703(5), for it is only with such entities that states are obliged to negotiate compacts. *Id.* § 2710(d)(3). Restricting class III gaming to tribes does not create a special or local law.

### iii. Elasticity of class

Elasticity is another measure of the nonspecific character of a law. "A statute worded so as to admit entry and exit from the class implies that the class formation was separate from consideration of particular persons, places, or things and, thus, not intended as special or local in operation." *Republic Investment Fund,* 800 P.2d at 1258–59. The Plaintiffs argue that tribal membership is "inelastic or closed." The Plaintiffs misconceive the elasticity analysis. Within the class of entities eligible to engage in class III gaming, the statute specifies no particular tribe, and tribes are free to seek compact negotia-

tions or let compacts expire unrenewed as they choose. The class is sufficiently elastic.

### c. Federal equal protection

The Plaintiffs contend that if the Governor, pursuant to section 5–601, gives tribes exclusive rights to conduct commercial slot machine, keno and blackjack gaming in Arizona, such exclusivity rests entirely on a racial distinction, in violation of federal equal protection principles. They contend that Congress's authority under the Indian Commerce Clause is not so great that Congress can compromise the Fourteenth Amendment.

In response, the Defendants argue that the status of tribes justifies targeted measures and does not violate the Equal Protection Clause, so long as the treatment is rationally related to Congress's unique obligations toward Indians. They argue that strict scrutiny is inapplicable, because preferential treatment for tribes is a political classification, not a racial one. They point out that only tribes, and not individual tribe members, may operate casinos.

In reply, the Plaintiffs argue that a tribe has power to engage in class III gaming only pursuant to a grant by the State, and if a state makes such a grant, it must observe Equal Protection principles. The Plaintiffs further submit that tribal gaming is not a matter of "uniquely Indian interest" that might justify an overt preference under the federal government's "unique obligation toward the Indians." Reply at 15.[36]

---

**36.** In reply, the Plaintiffs make two other arguments that the court will not entertain. First, they argue that "a state grant of tribal monopolies beyond the terms, procedures, and policies of IGRA" is barred. Reply at 14. To the extent that this assertion is meant as a claim that the proposed compacts violate IGRA, it is precluded by the court's analysis on the implied right of action question. See Part III.B, *supra.* To the extent it recapitu-

lates the ceiling argument, it has previously been addressed. *See* Part IV.B.1.b.

Second, the Plaintiffs contend that Congress lacks the power to "prohibit off-reservation gaming by persons of other races to increase the value of a tribal franchise" because that would violate the equal protection component of the Fifth Amendment Due Process Clause. *Id.* at 15. This statement emphasizes the State's lack of power to create

The key to the equal protection question, the parties agree, is whether tribal gaming compacts reflect Congress's obligation to legislate on behalf of federally recognized Indian tribes. Although a tribe's right to engage in class III gaming depends on the legality of such gaming under state law, the Defendants acknowledge that tribes' entitlement may be broader than that of persons permitted to conduct games under state law. Therefore, the Defendants attempt to justify the preference IGRA creates for tribes. Response at 22–23.

In *Morton v. Mancari*, 417 U.S. 535, 554, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974), the Supreme Court held that federal laws "reasonably designed to further the cause of Indian self-government" are scrutinized under the rational basis test. Preferences for members of federally recognized tribes are not racial preferences but rather political ones, for federal recognition of a tribe is a political and not a racial matter. *Id.* at 553 n. 24, 94 S.Ct. at 2484 n. 24; *cf. Rice v. Cayetano,* 528 U.S. 495, 120 S.Ct. 1044, 1062, 145 L.Ed.2d 1007(2000) (Breyer, J., concurring) (classifications based on ancestry are not permissible if ancestral group does not have a political structure to determine who its members are). Federal regulation of Indian affairs is "rooted in the unique status of Indians as a 'separate people' with their own political institutions." *United States v. Antelope,* 430 U.S. 641, 646, 97 S.Ct. 1395, 1399, 51 L.Ed.2d 701 (1977). The federal government also regulates Indians as persons subject to federal jurisdiction. *See id.;* 18 U.S.C. § 1153.

When the federal government creates a law applicable to all persons subject to federal jurisdiction, it does not violate equal protection as long as "its own body of law is evenhanded, regardless of the laws of States with respect to the same subject matter." *Antelope,* 430 U.S. at 649, 97 S.Ct. at 1400 (holding that application of federal law to Indians' crimes did not violate equal protection as an unfair race-based classification, where Indians were convicted of first degree murder under federal law, when elements for first degree murder under state law had not been proved). The *Antelope* Court recognized the possibility that regulations made for Indians pursuant to Indians' special status could result in a situation where federal law no longer applied consistently to all persons subject to federal jurisdiction, *id.* at 649 n. 11, 97 S.Ct. at 1400 n. 11, but declined to intimate a view on how this should be sorted out.

The Plaintiffs read footnote 11 for the proposition that "a federal statute which treats Indians differently without nexus to the separate governmental powers of tribes could fail the federal Due Process test." Motion (doc. # 46) at 25. The court agrees that a regulation treating Indians differently that cannot be justified under *Mancari* could violate equal protection. *See Dawavendewa v. Salt River Project Agr. Imp. and Power Dist.,* 154 F.3d 1117, 1124 (9th Cir.1998) (employer's preference for members of only one tribe violated Title VII). The question is whether A.R.S. § 5–601, if read to grant tribes casino gaming rights not allowed to others, is "reasonably designed to further the cause of Indian self-government." Motion at 27.

The Plaintiffs rely on *Williams v. Babbitt,* 115 F.3d 657 (9th Cir.1997) to argue that it is not. There, the Ninth Circuit considered the validity of a BIA regulation

such franchises. However, the Plaintiffs further maintain that no source of federal power over Indian tribes authorizes such a statute. The Plaintiffs have not asserted in their amended complaint or their summary judgment brief that IGRA is unconstitutional. The court shall not consider such a claim at this point.

that limited reindeer ownership in Alaska to members of Indian tribes. The BIA regulation was adopted pursuant to the Reindeer Act, designed to preserve what Congress considered the "native character" of the Alaska reindeer industry. *Id.* at 659–60. A non-Indian sought to import reindeer from Canada and was blocked by the BIA. The majority of the Ninth Circuit panel held that the BIA interpretation of the Reindeer Act was not entitled to deference because of the "seriousness of the constitutional doubts it raises." *Id.* at 663. Freed to interpret the Act *de novo,* the court determined that the Act does not prohibit non-native ownership of reindeer in Alaska. *Id.* at 666. The majority's approach allowed exploration of equal protection issues without ultimately resolving them. *Id.* On this portion of the opinion where constitutional doubts are merely raised, the Plaintiffs stake their equal protection claim.

The majority recognized that Congress may grant preferences to Indians. It insists, however, that only if a classification is entwined with traditional or "unique" Indian interests should the preference be considered politically based and analyzed for rationality under *Mancari. Williams,* 115 F.3d at 665. Classifications bearing on matters not affecting uniquely Indian interests are subject to strict scrutiny. *Id.* The majority went on to pointedly suggest that certain preferences do not relate to uniquely Indian interests:

> For example, we seriously doubt that Congress could give Indians a complete monopoly on the casino industry or on Space Shuttle contracts. At oral argument, counsel for the government conceded that granting natives a monopoly on all Space Shuttle contracts would not pass *Mancari*'s rational-relation test. Counsel could only distinguish the Space Shuttle preference from a reindeer preference by noting that, in 1937, natives were heavily involved in the reindeer

business whereas they aren't involved in the Space Program. The casino example defies this distinction, but is equally unrelated to "Congress' unique obligation toward the Indians." *Mancari,* 417 U.S. at 555, 94 S.Ct. at 2485.

*Id.* at 665.

As further grounds for "serious constitutional doubt" about the regulation, the *Williams* majority mentioned the impact of *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995), where the Supreme Court held that racial preferences must be narrowly tailored to remedy past discrimination. *Id.* at 665. Justice Stevens, dissenting in *Adarand,* wrote that the logical implications of the *Adarand* majority opinion jeopardized federal preferences for Native Americans. Drawing on this dissent, the *Williams* court predicted that *"Mancari*'s days are numbered." 115 F.3d at 665.

The Plaintiffs use *Williams* as follows. They begin by stating that IGRA does not require special treatment of Indians, but rather requires only that Indians be treated as well as other persons in Arizona. Since Congress has not set out to justify special treatment, the Plaintiffs argue that the State has no basis for granting tribes exclusive class III gaming permits. They then take their cue from the dicta of *Williams* to argue that because gaming does not uniquely affect tribal interests, the proposed compacts must be held to strict scrutiny and invalidated.

■■■ The court finds that equal protection is not violated. Congress did call for special treatment for tribes in IGRA, because by requiring states to enter compacts on terms permitted to "any person for any purpose" under state law, IGRA provides for gaming on tribal lands to benefit tribes, even where such for-profit gaming is not allowed to entities outside tribal lands. To prevail on their claim, the

Plaintiffs must demonstrate that Congress's grant of potentially exclusive gaming opportunities to tribes bears no rational relationship to any legitimate purpose. *See City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). Congress need only articulate "some reasoned explanation" for creating an Indian classification. *Narragansett Indian Tribe v. Nat'l Indian Gaming Comm'n,* 158 F.3d 1335, 1340–41 (D.C.Cir.1998).

In enacting IGRA, Congress found that tribes had been operating gambling to raise revenue on tribal lands. 25 U.S.C. § 2701(1). Congress also found that tribes benefitted from earning money through gaming in a manner that promoted tribal self-sufficiency and economic development. *Id.* § 2701(4). The limitation of such gaming to tribes on tribal lands is sufficiently related to Indian sovereignty over tribal lands to satisfy *Mancari*'s test.

■■■ The Plaintiffs do not argue here directly that *Adarand,* tightening the use of racial classifications of individuals for remedial purposes, overrules *Mancari*'s holding that preferences for Indian tribes are political and not racial. The court is aware that an implicit overruling has been suggested by Justice Stevens and acknowledged by the Ninth Circuit. However, *Mancari* is directly on point, is acknowledged as authoritative in cases involving tribes, *see Rice,* 528 U.S. at 519, 120 S.Ct. 1044, and is overruled by *Adarand* only depending on how broadly that opinion is construed. In these circumstances, the court must follow *Mancari* as the directly controlling case, for the Supreme Court reserves to itself the prerogative to find its opinions implicitly overruled by changing doctrine. *Agostini v. Felton,* 521 U.S. 203, 237, 117 S.Ct. 1997, 2017, 138 L.Ed.2d 391 (1997).

■■■ To the extent that A.R.S. § 5–601 may be read to authorize exclusive gaming privileges by tribes on tribal land, the Governor's decision to do so is also consistent with equal protection. Where a state law is enacted "in response to a federal measure" intended to achieve the result accomplished by the challenged state law, the state law itself need only "rationally further the purpose identified by the State" to be sustained against an equal protection challenge. *Washington v. Confederated Bands & Tribes of Yakima Indian Nation,* 439 U.S. at 500–501, 99 S.Ct. 740, 761 (1979). Legislative classifications are valid unless they bear no rational relationship to the State's objective to carry out federal law. *Id.* at 501, 99 S.Ct. at 762. Because the Arizona legislature has made no findings about tribal gaming, the Defendants rely on materials created for the Governor to support the rationality of her gaming decisions. These materials are subject to a motion *in limine.*

■■■ The Defendants move for the admission of a report called "Public Hearings on Indian Gaming," created by the Arizona Department of Gaming. The report, created at Governor Hull's behest by the Department's Director, Stephen Hart, describes sentiments expressed by persons who attended four public hearings in December 1999. The report consists of eleven pages summarizing testimony given at the hearings (Report Summary) and the rest consists of transcripts, written comments submitted at the meetings, etc. (Report Attachments). The Defendants argue that the eleven-page summary is admissible under Fed.R.Evid. 803(8) as a public report, and that the Attachments may be considered for the non-hearsay purpose of establishing a basis for the Governor's decisions. The Plaintiffs object, contending that none of the materials are relevant and all are hearsay, and that

the Attachments are more prejudicial than probative.

The Report was generated after four public hearings, held in Payson, Yuma, Phoenix and Tucson between November 30 and December 9, 1999. Over 1200 persons attended; how they came to participate is unknown, for sample selection methods are not described. The report "summarizes" the "themes" discussed at the hearings by announcing conclusions on every issue, presumably a summary representing the majority view. The report also suggests that the views expressed in the summary are the views of the public, but no statistical analysis is included to support such extrapolation.

 The court finds that the report is admissible, but its utility is limited to reflect its flaws. Courts take a broad approach to admissibility under Fed. R.Evid. 803(8)(C). Public reports are not inadmissible merely because they state conclusions or opinions, as long as the conclusions are trustworthy. *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 170, 109 S.Ct. 439, 450, 102 L.Ed.2d 445 (1988).

 The court may presume that public records are trustworthy, and it is the challenger's burden to show otherwise. *Johnson v. City of Pleasanton*, 982 F.2d 350, 352 (9th Cir.1992). In determining whether the "sources of information or other circumstances" indicate lack of trustworthiness, the Advisory Committee Notes list four suggested factors for consideration: (1) the timeliness of the investigation; (2) the special skill or experience of the official; (3) whether a hearing was held on the level at which conducted, and (4) possible motivational problems. *See* Advisory Committee Notes, Reprinted following Fed.Rules of Evid. 803, 28 U.S.C.A.

The Plaintiffs' objections to the Report Summary are well taken, for the conclusions the Report draws are not shown to have been derived from generally accepted or trustworthy methods. The Report Summary shall be considered to represent only the conclusions of the Department of Gaming about the prevailing opinions expressed at the hearings. As the Plaintiffs recognize, "this information may have been useful for determining political priorities." The conclusions in the Summary will not be considered to represent the views of the general public, however, for no appropriate statistical analysis has been done. In an age of polling, the failure to ensure a representative sample and an acceptable margin of error cannot be overlooked. The Summary also will not be considered for the truth of the opinions expressed, *e.g.*, that "gaming has not increased the volume of criminal activity, number of calls for service, or the volume of cases processed through the non-Indian criminal justice system," for there is no reason to believe that any of the speakers were qualified to speak to such matters.

The court shall admit the statements in the Attachments for the purpose of showing that members of the public attending the hearings felt that they had benefitted from Indian gaming. The court sees no risk of unfair prejudice if the statements are properly understood as anecdotal. The motion *in limine* is granted in part and denied in part.

Based on the Report and other evidence, the Governor could rationally conclude that casino gaming on tribal lands should be continued. While the Plaintiffs argue that the Governor could better pursue a poverty-reduction policy by allowing all local governments, including municipalities, to conduct casino gaming, the pertinent question is whether the Governor's policy is rational. The Plaintiffs have not shown that tribal gaming pursuant to IGRA is so contrary to state interests or so arbitrary as to be irrational. The fact that the Governor resorted to an anecdotal sam-

pling of public opinion to guide her strategy only confirms, however, that § 5–601 gives her unbridled discretion to formulate gaming policy.

### d. Equal privileges

The Plaintiffs believe that compacts authorizing tribal monopolies in slot machine, keno and blackjack gaming violate the equal privileges clause in the Arizona Constitution. The Plaintiffs argue that Ariz. Const. art. II, § 13 enshrines the principle of equal opportunity for businesses, and is more rigorous than federal equal protection analysis. Motion at 22.

▮▮▮▮▮ Article II, section 13 of the Arizona Constitution prohibits the State from granting any person or corporation, other than a municipality, "privileges or immunities which, upon the same terms, shall not equally belong to all citizens or corporations." The Arizona Supreme Court interprets the equal privileges clause "to secure equality of opportunity and right to all persons similarly situated." *Prescott Courier, Inc. v. Moore,* 35 Ariz. 26, 274 P. 163, 165 (1929). The effects of the state equal privileges clause and the federal equal protection clause are essentially the same, *State v. Bonnewell,* 196 Ariz. 592, 2 P.3d 682, 686 (App.1999), although the Arizona law has unique roots in a fear of overreaching by business entities. *See Martin v. Reinstein,* 195 Ariz. 293, 987 P.2d 779, 799 n. 18 (App.1999); *see generally* John D. Leshy, *The Arizona State Constitution* 54 (1993).

▮▮▮▮▮ There is no equal privileges issue here because there is no discrimination among similarly situated persons. Tribes, unlike Plaintiffs, are sovereign political entities and not subject to state regulation. Nevertheless, even if the Plaintiffs were similarly situated, there is no violation of equal privileges rights. The privilege in question—to engage in class III gaming—implicates only economic rights and no fundamental right. The

State's rule limiting class III gaming to tribes on tribal land must be only rationally related to furthering some legitimate governmental interest. *See Big D Const. Corp. v. Court of Appeals,* 163 Ariz. 560, 789 P.2d 1061, 1067 (1990). The State may rationally draw a regulatory distinction based on land ownership. *See Bonnewell,* 2 P.3d at 685 (upholding a law banning leghold traps on public land but not on private land). Analogously, the State may legitimately decide to limit class III gaming to tribal lands. The Defendants theorize that Arizona would choose to endorse class III gaming only for tribes to promote strong tribal government, economic development, and self-sufficiency of tribal lands. Response at 27. The Plaintiffs do not show that these motives cannot reasonably be achieved by the State's tribal gaming policy. For the reasons discussed above in the equal protection analysis, tribes are not similarly situated to the Plaintiffs because they are political sovereigns not otherwise subject to state regulation.

Notably, class III gaming is not "presumptively a legitimate business," an element that the Arizona Supreme Court has mentioned as a factor in determining whether a regulation unfairly limits economic activity. *See State v. Childs,* 32 Ariz. 222, 257 P. 366, 367 (1927); *Elliott v. State,* 29 Ariz. 389, 242 P. 340, 341–42 (1926) (If a law prohibits the exercise of occupations, "legitimate and laudable in themselves," while allowing other businesses not reasonably distinguishable to be carried on freely, it violates the equal privileges clause). Rather, gambling is broadly banned in Arizona, and Arizona citizens and corporations have no reasonable baseline expectation to conduct such enterprises. The equal privileges clause is not violated by Arizona's actions to convey an exclusive class III gaming franchise on tribes.

### 3. Compacts are *ultra vires*

The Intervenor believes that compacts are treaties and states cannot make treaties. It also describes compacts as legislation, the effectiveness of which is contingent on tribal approval. While the court questions whether the Intervenor has standing to assert these claims, Defendants have not asserted a jurisdictional defect. Assuming that the Intervenor has standing, the court rejects these theories on their merits.

#### a. *Compacts as treaties*

▮▮▮ The United States Constitution allocates treaty-making authority exclusively to the President, with the advice and consent of the Senate, Art. II § 2, and prohibits states from concluding treaties, Art. I § 10. The Intervenor contends that Congress cannot enable Arizona to enter treaties with Indian tribes. Opening Brief (doc. # 43) at 5.

The court rejects the Intervenor's superficial characterization of tribal-state compacts as "treaties." *United States v. Reid*, 73 F.2d 153, 155 (9th Cir.1934), defines treaties as contracts between nations. Although states are sovereigns, they are not nations.

▮▮▮ No one today, including the President of the United States, makes treaties with Indian tribes. 25 U.S.C. § 71; *see Antoine v. Washington*, 420 U.S. 194, 201–02, 95 S.Ct. 944, 949, 43 L.Ed.2d 129 (1975). Congress exercises its plenary power to mediate relations between the United States and tribes through legislation. *Antoine*, 420 U.S. at 203, 95 S.Ct. at 950. By virtue of the Supremacy Clause, Congressional acts are "superior and paramount to the authority of any State within whose limits are Indian tribes." *Id.* at 204, 95 S.Ct. at 950 (quoting *Dick v. United States*, 208 U.S. 340, 353, 28 S.Ct. 399, 403, 52 L.Ed. 520 (1908)). Congress may, however, cause state regulation to extend to tribal land if it specifically directs such

an incursion. *Washington v. Confederated Bands and Tribes of Yakima Indian Nation*, 439 U.S. 463, 501, 99 S.Ct. 740, 761, 58 L.Ed.2d 740 (1979).

With IGRA, Congress imposed federal regulation on tribal gaming capacities. *Santa Ana v. Kelly*, 104 F.3d 1546, 1549 (10th Cir.1997); *see generally* Rebecca Tsosie, *Negotiating Economic Survival: The Consent Principle and Tribal–State Compacts under the Indian Gaming Regulatory Act*, 29 Ariz. St. L.J. 25, 56–57 (1997). IGRA improves on the method of adopting state laws by creating a mechanism whereby tribes and states negotiate to determine which state gaming regulation should apply on tribal lands. The approval of the Secretary of the Interior enfolds the negotiated compact terms into federal law.

The status of tribal compacts as a creation of federal statute suffices to dispatch the Intervenor's argument, at least as presented here. Unquestionably, compacts raise complicated issues of federalism, but the Intervenor has not demonstrated why tribal-state compacts should be viewed as treaties or offered a constitutional theory on which the court might proceed. The constitutional prohibition on states making treaties must be reconciled with state power to enter compacts; moreover, the boundary between these two constitutional clauses is blurred by devolution of federal policy-making authority to states. If a treaty is a contract between sovereigns, as the Intervenor proposes, it is far from clear that states should be viewed as sovereigns when they make tribal compacts, given the extent that superior federal law channels the results.

#### b. *Compacts as legislation contingent on tribal approval*

▮▮▮ The Intervenor argues that compacts violate Article III of the Arizona Constitution because compacts are expres-

sions of state law and may not be contingent on tribal approval. This argument is without merit. Compacts must be made pursuant to state law but are not themselves state law. Arizona has no jurisdiction to legislate in tribal lands; a compact pertaining to tribal land is not state law.

## CONCLUSION

The Plaintiffs and Intervenor prevail on one of their claims, that A.R.S. § 5–601 is an unconstitutional delegation of legislative power. Injunctive relief is appropriate, and the court shall enter judgment to that effect shortly. Before doing so, the court desires guidance from the parties as to the appropriate phrasing of such relief. The parties are directed to attempt to collaborate on a proposed form of judgment, to be lodged within 15 days of the filing of this order. If negotiations between the parties fail, within 5 days after the date for submitting a stipulated form of judgment, each shall separately submit a proposed form of judgment. Until the court enters judgment, the preliminary injunction that has preserved the status quo in this matter shall be extended.

THEREFORE IT IS ORDERED, denying Defendants' Motion to Dismiss for Failure to Join Indispensable Parties (docs.# 28, 50).

IT IS FURTHER ORDERED, denying in part and granting in part Defendants' Motion to Dismiss (Justiciability) (doc. # 49).

IT IS FURTHER ORDERED, granting in part and denying in part Defendants' Motion in Limine (doc. # 73).

IT IS FURTHER ORDERED, denying in part and granting in Plaintiffs' Motion for Summary Judgment (doc. # 46). Plaintiffs and Intervenor prevail on their claims that A.R.S. § 5–601 violates the Arizona Constitution.

IT IS FURTHER ORDERED directing the parties to submit a proposed form of judgment within 15 days. Failing agreement, each party shall submit a proposed form of judgment within 5 days thereafter.